### UNITED STATES v. ATCHISON, T. & S. F. RY. CO.

(Circuit Court, W. D. Missouri, W. D. December 4, 1905.)

#### Nos. 3,008, 3,020.

1. INJUNCTION—VIOLATION—CONTEMPT—INFORMATION.
   An information for contempt at the relation of the United States against a railroad company for violation of a temporary injunction restraining it from granting rebates is criminal in character. In such proceeding the defendant is entitled to every reasonable doubt as to the obligatory force of the mandate, and whether its disobedience was willful.
   [Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, § 514.]

2. SAME.
   If the court issuing the injunction alleged to have been violated had no jurisdiction of the subject-matter of relief prayed for in the bill, the restraining order was void, and no contempt could be predicated of its disregard.
   [Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, § 439.]

3. CARRIERS—JURISDICTION—ENJOINING GRANT OF REBATES.
   Prior to the enactment by Congress of the Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]), a United States Circuit Court had no jurisdiction in equity over a suit instituted by direction of the Attorney General of the United States to enjoin a railroad company from granting rebates under the interstate commerce law, especially where no order had hitherto been made by the interstate commerce commission on the railroad company to discontinue the forbidden act.

4. SAME.
   The interstate commerce act and the act known as the "Sherman Anti-Trust Law" are separate and independent acts, not germane in character and purpose; and therefore jurisdiction in the Circuit Court of the

United States over a bill in equity to enjoin a railroad company from granting rebates to favored shippers cannot be maintained upon the ground that such act of the railroad company is a monopoly within the meaning of the second section of said anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]).

5. STATUTES—CONSTRUCTIVE PROSPECTIVE OPERATION.

Statutes are presumed to be prospective in operation, and the courts refuse to give a retroactive effect to statutes, unless the intention is so clear and positive as by no reasonable possibility to admit of other construction.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Statutes, § 344.]

6. SAME.

The doctrine of relation, like every other fiction of the law, has its limitations. It can never be applied where its root was not planted in an antecedent lawful right.

7. INJUNCTION—ENJOINING GRANT OF REBATES—VIOLATION—VOID ORDER—CONTEMPT.

A suit in equity instituted by the Attorney General of the United States to enjoin a railroad company from granting rebates, and a restraining order made thereon in March, 1902, were not validated by the enactment of the Elkins act in February, 1903 (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]). *Held*, further, that if the suit could have been continued under the Elkins act, where the antecedent offense of the railroad company was being continued after February 19, 1903, an action by the United States attorney in the summary method authorized by the latter act would have presented an issue of fact entitling the defendant to a hearing thereon; and any injunction granted would be as to violations of law then being committed, but would not have the effect to vitalize an antecedent injunctive order granted by the court when it had no jurisdiction to make it. *Held*, further, that where no such action was taken by the United States attorney after the passage of the Elkins act, an information for contempt filed by him, based on a violation of such void order, has not the effect to bring it within the operation of the Elkins act.

8. SAME—CONSTRUCTION OF ORDER—CONTEMPT.

Where the bill for an injunction against a railroad company, at the relation of the United States attorney, for granting rebates, in its specifications describes only grain and packing-house products of meat on which rebates were being granted, followed by a general allegation that the defendant was likewise granting rebates on other necessities of life, the subjects of interstate traffic, etc., and the injunctive order specifically enjoined the granting of rebates on the specified articles of traffic "or any other interstate traffic," *held*, that the latter general term, on the rule of "ejusdem generis" and "noscitur a sociis," is controlled by the antecedent particularization, and is limited to objects of like kind with those specified; and therefore an information for contempt, predicated of alleged rebates granted by the defendant a year or so afterwards in another jurisdiction on the commodities of salt and coal, could not be sustained under such limited restraining order.

9. CARRIERS—REBATES—TRAFFIC RATES—DIVISION.

Where a short line railroad, chartered by the state, authorized to haul freights for hire, is owned by stockholders common to said short road and the shipper, and a long distance railroad connecting therewith enters into a joint traffic arrangement with it for the transportation of interstate traffic, and the two roads file and publish such joint rates, as required by the interstate commerce law, and live up to the same—Quære: Can an information by the United States attorney against the interstate carrier

142 F.—12

for granting rebates to such shipper be sustained on evidence tending to show that the division of the through rate is grossly disproportioned to the haul over such short line?

(Syllabus by the Court.)

## Motion to Quash Information.

This is a proceeding for contempt, growing out of a temporary restraining order made by this court on March 25, 1902. The restraining order was predicated upon a bill of complaint in equity filed by the United States attorney for this district, under direction of the Attorney General of the United States, against the defendant railroad company. The bill recited that the action was taken on the request of the Interstate Commerce Commission. It charged that the defendant railroad company, a corporation of the state of Kansas, was engaged in the transportation of interstate commerce; that in conformity to the requirements of the interstate commerce act of congress it had filed with the Interstate Commerce Commission at Washington City a copy of schedule of rates and charges established and published by it for the transportation of freight traffic; among other things, on cured meats, known as "packing-house products," and also on dressed meats, for transporting the same from Kansas City, Mo., and Kansas City, Kan., across the states of Missouri, Iowa, and Illinois, to the city of Chicago, Ill., and other points known as "Chicago common points"; that these were the only lawful rates for transporting such commodities between said points prior to January, 1902, to the time of the institution of the suit. That notwithstanding its duty to ship at no greater or less rate in that regard, the defendant, combining and confederating with certain persons, to the orator unknown, to create a monopoly in the transportation of said commodities on defendant's line of railway between the points aforesaid, early in the year 1901, entered into an agreement or agreements with the persons unknown to transport such commodities between such points at rates much less than the published, established rates on said commodities. It is then charged that in pursuance of said combination the defendant transported such packing-house products from Kansas City, Mo., to Chicago and Chicago common points, billing the same at the established rate therefor, but in pursuance of said unlawful agreement rebating to such unknown persons the difference between the rate agreed upon and the established rate, and transported such traffic at less than schedule rates. In paragraphs 5 and 6 the bill charges that prior to the 1st day of January, 1901, the defendant filed with the Interstate Commerce Commission its schedule of rates established jointly with connecting railways, for the transportation of grain from Mississippi river points to New York and New York common points, and from Kansas City, Mo., to the Mississippi river points aforesaid, and to Chicago and Chicago common points. These paragraphs refer exclusively to grain and its transportation between the points specified. The seventh paragraph then charges that the defendant granted to certain favored grain buyers and shippers, whose names are unknown, who shipped wheat, corn, and other grain over the defendant's line between the points aforesaid, large concessions and rebates from its published and established schedules, whereby such shippers obtained from the defendant unlawful rebates in respect to such shipments on grain between the points aforesaid. There is no charge in this paragraph of any combination or monopoly; it is simply a charge for carrying grain for certain shippers below the schedule rates. The ninth paragraph charges that during the period complained of shippers could not, at the points of origin, without ruinous loss, purchase at market prices and pay transportation to eastern destination at the said published and established rates. This charge refers to "said commodities"; but does not specify packing-house products, dressed meats, or grain. The bill prayed for special and general injunctions against the defendant.

A temporary restraining order was granted and set for the 23d day of June, 1902, for further hearing. It recited that until that date, or the further order of the court, the defendant, its officers, agents, and servants, be enjoined and restrained from further acting under and enforcing, or executing in any manner whatever, any agreement to transport over the defendant's

railroad, or any part thereof, between the states, any packing-house products, dressed meats, grain, or the products of grain, or any other interstate traffic, at any greater or less rate than the rates named for such services in defendant's established schedule in force on its lines, and at the time said traffic is transported on file with the Interstate Commerce Commission, or from departing from their schedule rates in carrying any of said above products or traffic between the states, and enjoining them from hereafter agreeing with any shipper or other person to transport such traffic at any other or different rates than such as may be provided for in its schedules as filed and published; and enjoining them from paying any rebates, or making any concessions whatever in defendant's rates and charges whereby any such traffic transported by said defendant over its railroad, or in respect to any traffic in the transportation of which said defendant may participate, shall be carried by it at any rate different from the established rate at the time such traffic shall be transported, "without prejudice to the right of the defendant to move at any time to vacate this order upon such ground as it may be advised, and no ground shall be deemed waived by reason of defendant not having presented them in opposition to this application."

On June 2, 1902, the defendant filed demurrer to the bill on the following grounds: (1) That the complaint does not state any such cause as ought, in a court of equity, to entitle the complainant to any such relief as prayed for; that the bill does not contain any matter of equity, on account of which this court could grant any decree, or give the complainant any relief against the defendant. (2) That the court has no jurisdiction to hear and determine the action; and that the court, as a court of equity, cannot take cognizance of the matters set forth in the bill, and has no power or jurisdiction to hear or determine the same. (3) That as to so much of the bill as seeks a general injunction restraining the defendant from hereafter agreeing to pay rebates, or transporting at less than the published tariff, the court has no jurisdiction to hear and determine this action, and no power to issue any general injunction as prayed for in the bill. This demurrer was not heard until some time during the early part of 1903; and on May 8, 1903, the demurrer was overruled; and leave was given to the defendant to file answer to the bill within 30 days; and in the meantime the temporary restraining order was continued in force until the further order of the court.

On May 25, 1903, the defendant filed answer, taking issue on the allegations of the bill respecting any combination or confederation with other persons to transport such commodities between such points at less than the published rates; or that in pursuance of any such unlawful agreement it rebated or refunded, or paid back to the shippers, the difference between the established rates and the amount alleged to have been agreed upon, or that it transported such traffic at less compensation than that specified in the published rates, or that it in any instance departed from the established rates; or that it granted to favored shippers, or any other shippers, lower or different rates than those named in its lawful published schedule or rates on any traffic. It also denied any intent or ultimate purpose to continue in the future to transport traffic nominally at its published rates and charges, and subsequently by unlawful rebates or concessions to depart therefrom. The answer also denied that the complainant was entitled to any relief in a court of equity. No further action was taken on these issues other than the appointment of an examiner to take testimony, and no testimony has been taken.

On the 19th day of August, 1905, the complainant, the United States of America, filed in this court an information, charging the defendant with the violation of said restraining order, in that between the 26th day of March, 1902, and the 1st day of January, 1904, in violation of the interstate commerce law, and contrary to the rates of traffic established in its published schedules, etc., the defendant, its officers, agents, and servants, wrongfully and knowingly violated and disregarded said temporary restraining order, in that it carried on its line of road between and among the states and between certain states and territories of the United States, salt at a different and less rate than that named and specified in its published schedules of rates, and more particularly for the Hutchinson-Kansas Salt Company, a Kansas cor-

poration. The information charged that the Hutchinson-Kansas Salt Company was engaged in the business of manufacturing salt at Hutchinson, in the state of Kansas, and of transporting and selling the same at all points along the Missouri river and more particularly in the states of Kansas, Missouri, and Nebraska; that the said Hutchinson-Kansas Salt Company owned and controlled numerous salt wells in said territory, and numerous mills for the manufacture of salt, about nine in number, the largest of which said mills so owned by said salt company was known as the "Morton Mill"; that the tracks of the defendant company ran on one side of said mill, and the tracks of the Chicago, Rock Island & Pacific Railway Company ran on the other side thereof, and that there are two switches connecting both sides of said mill with the tracks of said railway companies; that there is also in connection with said mill another track known as the "cinder track"; that the entire length of these switches and sidings is less than a mile in length, and were originally constructed by the said Hutchinson-Kansas Salt Company for the purpose of connecting said large mill known as the "Morton Mill" with both of said railway systems; that said switches, etc., were owned and maintained by said salt company, and that no switching charges of any character were charged to any railroad corporation for the use thereof in the transportation of the product of said mills; that in July, 1902, a certain railroad corporation was organized known as the "Hutchinson & Arkansas River Railroad Company" by the officers and stockholders of the salt company; that the salt company pretended to sell and did convey said switches to said last-named railroad corporation; that for the purpose of evading the temporary restraining order heretofore referred to, and in violation of the terms thereof, the defendant made pretended joint tariffs and schedules with the Hutchinson & Arkansas River Railroad Company; that the agreement as to such joint tariffs while nominally made with the Hutchinson & Arkansas River Railroad Company was, in truth and in fact, an agreement made and entered into with the Hutchinson-Kansas Salt Company, whereby the salt company was to receive rebates and concessions upon the transportation of salt from said city of Hutchinson, in the state of Kansas, to points upon the Missouri river. The information then sets out the manner in which this was accomplished. It is then charged that in pursuance of such understanding the defendant on or about the 1st day of August, 1902, published and filed with the Interstate Commerce Commission a joint tariff agreement with the Hutchinson & Arkansas River Railroad Company, showing the rates on salt from Hutchinson to the points aforesaid; and that between the 1st day of August, 1902, and the 1st day of January, 1904, the defendant, from time to time, carried and transported for said salt company as aforesaid, for use in the manufacture of packing-house products at the points aforesaid, and as such business was performed made settlements with the Hutchinson-Kansas Salt Company, in which the defendant paid to the salt company 25 per cent. of said joint tariff rate on all salt so transported, to the extent of many thousands of dollars; all of which, the information charges, appears from evidence taken before the Interstate Commerce Commission at hearings in Hutchinson, Kan., and Chicago, Ill., on the 5th and 22d days of December, 1903, which evidence is filed as an exhibit with the information. The information further charges that between the 1st day of August, 1902, and the 1st day of January, 1904, there were, in the city of Hutchinson and its immediate vicinity, other persons, whose names are unknown, engaged in the business of manufacturing salt, and selling and shipping the same to Missouri river points over the line of the defendant; that such persons were compelled and required by the defendant to pay the full freight rates and charges named in the published and established schedules, whereby the defendant unlawfully discriminated against such other persons in favor of the Hutchinson-Kansas Salt Company.

On September 16, 1905, the defendant filed motion to quash the information upon the ground that the bill of complaint, on which the restraining order was issued, which complained only of alleged violations of the interstate commerce law, in respect of the transportation of certain commodities prior to the filing of the bill, was not predicated upon any lawful order or requirement of the interstate commerce commission; that at the time of filing the com-

plaint and the issuing of the restraining order this court was without jurisdiction or authority to entertain said bill, or to make said restraining order; that no amendment to said bill was filed by the complainant against the defendant alleging or showing any violation of the provisions of the interstate commerce law by defendant in respect to any alleged departures from its published tariff rates in favor of any shippers after the passage of an amendment to said interstate commerce law known as the "Elkins Act," approved February 19, 1903 (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]), which said act for the first time gave this court jurisdiction to entertain bills of complaint on behalf of the United States against railway companies to restrain them from giving to any shipper a less rate than that contained in its published schedules. And, further, that the court was without jurisdiction after the passage of said Elkins act to issue any injunction covering the acts complained of in the information filed herein, for the reason that under said act and section 16 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), the defendant could be proceeded against in equity only in the jurisdiction where it had its principal office, or in which the act complained of was committed, and there is no allegation in the original bill filed herein, or in the information, that the defendant had its principal office within this judicial district, or that the act complained of was committed either in whole or in part within said district; but, on the contrary, the bill and information allege that the defendant is a corporation of the state of Kansas, and the information avers that the act complained of was committed wholly within said state; and hence not within this judicial district. And further, that in the bill of complaint the only specific charge made against the defendant with regard to departure from its published rates in favor of particular shippers, was in respect to rates concerning the transportation of grain and packing-house products over its lines; and no charge was made concerning the transportation of salt, or a departure from the published rates thereon; that said bill was wholly insufficient to warrant the issuing of a restraining order in respect of rates concerning the transportation of salt; and that the restraining order in respect of any other commodities than grain or packing-house products was unwarranted. And further, that it does not appear from the information that in the transportation of salt from Hutchinson, Kan., the defendant violated the terms of said restraining order; but on the contrary it appears that the traffic mentioned was transported under the rate specified in its published tariffs or on joint published tariffs, to which this defendant was a party, and which were duly published and filed with the Interstate Commerce Commission, and that the information is otherwise insufficient and uncertain.

Gardiner Lathrop, for the motion.

M. D. Purdy, Asst. Atty. Gen., and A. S. Van Valkenburgh, U. S. Dist. Atty., opposed.

PHILIPS, District Judge (after stating the facts). The United States having no pecuniary interest in the subject-matter of the original bill of complaint, acting only pro bono publico, the alleged contempt belongs essentially to what is termed "criminal contempts," to vindicate the dignity of the court. In re Nevitt, 117 Fed. 448, 458, 54 C. C. A. 622, 632; Bessette v. Conkey Company, 194 U. S. 324, 24 Sup. Ct. 665, 48 L. Ed. 997. As such the proceeding is to be strictly construed in favor of the personal liberty of the defendant. As it is to vindicate the dignity of the court in compelling respect for its mandate, a judge may best demonstrate his title to respect by according to the accused the benefit of any reasonable doubt in his own mind as to the obligatory force of his command, and whether or not its disobedience was willful. In re Watts et al., 190 U. S. 32, 23 Sup.

Ct. 718, 47 L. Ed. 933. If the court issuing the temporary restraining order had no jurisdiction to make it under the bill of complaint, because it was without the power to proceed to final adjudication of the matters embraced in the bill, the order was one which the defendant was under no legal obligation to observe, and could not, therefore, be adjudged in contempt for disregarding it.

In Re Sawyer et al., 124 U. S. 200, 8 Sup. Ct. 482, 31 L. Ed. 402, one Parsons, who claimed to have been elected police judge of Lincoln, Neb., filed a bill in equity in the United States Circuit Court, praying for an injunction to restrain the mayor and councilmen of the city from proceeding further with certain charges against him, or taking any vote on the report of the committee declaring the office of police judge vacant, or appointing any person to fill that office. A temporary restraining order was issued accordingly which the mayor and council failed to obey. They were cited for contempt, found guilty and adjudged to pay a fine, and in default to stand committed to the custody of the marshal. On writ of habeas corpus the jurisdiction of the Circuit Court over the subject-matter was challenged, and consequently its right to issue the injunction. The Supreme Court held that the Circuit Court was without jurisdiction to entertain the bill in equity for an injunction. Mr. Justice Gray quoted from Elliott v. Peirsol, 1 Pet. 328, 340, 7 L. Ed. 164, the following: ·

"Where a court has jurisdiction, it has a right to decide every question which occurs in the cause; and whether its decision be correct or otherwise its judgment, until reversed, is regarded as binding in every other court. But, if it act without authority, its judgment and orders are regarded as nullities. They are not voidable, but simply void."

Further on he said:

"The Circuit Court being without jurisdiction to entertain the bill in equity for an injunction, all its proceedings in the exercise of the jurisdiction which it assumed are null and void. The restraining order, in the nature of an injunction, it had no power to make. The adjudication that the defendants were guilty of a contempt in disregarding that order is equally void; their detention by the marshal under that adjudication is without authority of law, and they are entitled to be discharged."

To the same effect are the following authorities: Ex parte Rowland, 104 U. S. 604, 26 L. Ed. 861; In re Ayers, 123 U. S. 443, 8 Sup. Ct. 164, 31 L. Ed. 216; Worden v. Searls, 121 U. S. 26, 7 Sup. Ct. 814, 30 L. Ed. 853; Ex parte Terry, 128 U. S. 289, 9 Sup. Ct. 77, 32 L. Ed. 405; Ex parte Fisk, 113 U. S. 713, 5 Sup. Ct. 724, 28 L. Ed. 1117; Ex parte Buskirk, 72 Fed. 14, 18 C. C. A. 410, 25 U. S. App. 613.

So in St. Louis, etc., Railroad Company v. Wear, 135 Mo. 230, 265, 36 S. W. 357, 366, 33 L. R. A. 341, the court said:

"It is always permissible to show, upon process for contempt, that the order disobeyed was beyond the jurisdiction of the authority from which it emanated. If that showing is successfully made, no punishable contempt has been committed."

Growing out of this established rule is the further principle: The order alleged to have been violated must not only come clearly within the competency of the court to make, but the thing or act enjoined

must be clearly and definitely defined, so as to leave the party enjoined in no reasonable doubt or uncertainty as to what specific thing or act is prohibited. Rapalje on Contempt, p. 20; Weeks v. Smith, 3 Abb. Prac. 211–214; In re Cary (D. C.) 10 Fed. 622, note. Did the court have jurisdiction to maintain and enforce in equity the relief prayed for in the bill of complaint? It was filed at the instance of the Attorney General of the United States on behalf of the United States, to enjoin the defendant railroad company from violating the interstate commerce law inhibiting the granting of rebates by the defendant carrier to favored shippers engaged in the shipping of grain and packing-house products from Missouri river points to Chicago, Ill., and common points of distribution there.

It is true that allegations of a general character were inserted in the bill, with the evident purpose of giving a semblance of jurisdiction to the United States Circuit Court in equity as conferred by what is known as the "Sherman Anti-Trust Law." Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]. There is a general charge in the bill that the defendant combined and confederated with certain persons, unknown, to create a monopoly in the transportation of said commodities on defendant's line of railway between the points aforesaid, "to transport such commodities between said points at rates much less than the published, established rates on such commodities at that time filed with said commission and in lawful force on defendant's line." This charge is confined to packing-house products and dressed meats; and the transportation involved was only between the specified points, and the monopoly was to be accomplished by giving to certain persons rates less than the schedule rates. It is not charged that such persons were favored over other shippers, or that these rates were not given to all shippers. This is immediately followed by the allegation that in pursuance of said combination the defendant transported "such packing-house products" from Omaha and Missouri river common points to Chicago and Chicago common points, billing the same at the established rates, but secretly transported such traffic at less than scheduled rates.

Section 2 of said anti-trust act is as follows:

"Every person who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments in the discretion of the court."

In the United States v. Joint Traffic Association, 171 U. S. 505, 568, 19 Sup. Ct. 25, 31, 43 L. Ed. 259, the court said:

"In Hopkins v. United States (decided at this term) 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, we say that the statute applies only to those contracts whose direct and immediate effect is a restraint upon interstate commerce and that to treat the act as condemning all agreements under which, as a result, the cost of conducting an interstate commercial business may be increased, would enlarge the application of the act far beyond the fair meaning of the language used. The effect upon interstate commerce must not be indirect or incidental only. An agreement entered into for the purpose of promoting the legitimate business of an individual or corporation,

with no purpose to thereby affect or restrain interstate commerce, and which does not directly restrain such commerce, is not, as we think, covered by the act, although the agreement may indirectly and remotely affect that commerce. We also repeat what is said in the case above cited, that 'the act of Congress must have a reasonable construction, or else there would scarcely be an agreement or contract among business men that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly to restrain it.' "

While the bill under review does not allege an unlawful restraint, but a monopoly, the language and thought of the Supreme Court used in respect of the construction of the act as it touches contracts in restraint of trade, apply with equal force to an alleged monopoly. The statute, by no expression or implication, interdicts the increase of a railroad's business by any competition, however energetic, eager or grasping. The essence of the charge in the bill of complaint is that the defendant, by carrying in fact at a rate below that established and published, tried to get all the transportation it could of the designated products. In the Trans-Missouri Joint Traffic Association Cases the reasoning of the court was that the agreement there involved directly tended to obstruct free competition. By the portion of the bill here touching the Sherman act, it seeks to enjoin the defendant from doing the very act which, in the Trans-Missouri Joint Traffic Case, the court held to be unlawful in repressing. The truth is that, as the Department of Justice at Washington was somewhat in nubibus in its experiment with the resort to equity in order to escape the embarrassing question of the jurisdiction of the court, general allegations of a monopoly under the anti-trust act were thrown out as a possible life-preserver.

If, as contended by the United States attorney in his oral argument and brief, the bill of complaint is to be sustained on the ground of an allegation respecting monopoly under the Sherman act, how is this contempt proceeding to be sustained on that basis? The Sherman anti-trust act is an independent statute. It cannot be eked out or assisted by the interstate commerce act to create an offense under it. As the monopoly charged was a "combining and confederating with certain persons who are to the orator unknown, to create a monopoly in the transportation of said commodities (packing-house products) on defendant's line," how is the information for contempt to be sustained on the ground that, between the 1st day of August, 1903, and the 1st day of January, 1904, the defendant violated the injunction by a device whereby it granted rebates to a favored shipper of salt at Hutchinson, Kan.? The only charge of a monopoly predicated in the bill of complaint was in respect of packing-house products from Missouri river points east. The prayer of the bill in that part known as "the omnibus prayer for relief" is that the defendant, its officers, etc., be restrained "from paying any rebate or making any concession whatever, either by direct or indirect means, whereby any traffic transported by said defendant over its railroad, or in respect to any traffic in the transportation of which said defendant may participate shall be carried by it at any rate different from the lawfully published rate then established, etc." And so was the restraining order limited. The

information does not contain any allegation that the act in transporting salt constituted a monopoly. And yet, it is seriously contended that the jurisdiction of the court can be maintained on the ground of a monopoly interdicted by the anti-trust act, and of consequence the defendant can be charged with contempt on the ground of monopoly for having granted a rebate. The position is obviously untenable.

The bill of complaint must stand alone upon the interstate commerce act. The bill, as framed, and the argument made in support thereof at the hearing on the demurrer, were all based upon the broad proposition that, at common law, at the instance of the Attorney General of the United States, the United States had the right, in execution of the declared public policy of the general government in respect of the regulation of interstate commerce, to appeal to the equity side of its own courts for an injunction; that as by its legislation it was declared to be unlawful for any railroad, engaged in the carriage of interstate commerce, to make discriminations by the method of granting rebates to favored shippers, it could invoke the jurisdiction of this court to enjoin the offending railroad from doing such forbidden act. But after argument and submission of the demurrer to the bill the Supreme Court in Missouri Pacific Railway Company v. United States, 189 U. S. 274, 23 Sup. Ct. 507, 47 L. Ed. 811, held, as expressed in the syllabus, that prior to the passage of the act of Congress "to further regulate commerce with foreign nations and among the states," approved February 19, 1903 (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]), a District Attorney of the United States under the direction of the Attorney General of the United States in pursuance of a request by the Interstate Commerce Commission was without power to commence a proceeding in equity against a railroad corporation to restrain it from discriminating in its rates between different localities. And, therefore, there was error committed below in refusing to sustain a demurrer of the defendant railroad company to a bill filed by a District Attorney of the United States under the circumstances stated.

The third section of the act of February 19, 1903 (32 Stat. 848, c. 708 [U. S. Comp. St. Supp. 1905, p. 600]), known as the "Elkins Act," is as follows:

"That whenever the Interstate Commerce Commission shall have reasonable ground for belief that any common carrier is engaged in the carriage of passengers or freight traffic between given points at less than the published rates on file, or is committing any discrimination forbidden by law, a petition may be presented alleging such facts to the Circuit Court of the United States sitting in equity having jurisdiction; and when the act complained of is alleged to have been committed or is being committed in part in more than one judicial district or state, it may be dealt with, inquired of, tried, and determined in either such judicial district or state, whereupon it shall be the duty of the court summarily to inquire into the circumstances, upon such notice and in such manner as the court shall direct and without the formal pleadings and proceedings applicable to ordinary suits in equity * * * and upon being satisfied of the truth of the allegations of said petition said court shall enforce an observance of the published tariffs or direct and require a discontinuance of such discrimination by proper orders. * * * It shall be the duty of the several district attorneys of the United States, whenever the Attorney General

shall direct, either of his own motion or upon the request of the Interstate Commerce Commission, to institute and prosecute such proceedings, and the proceedings provided for by this act shall not preclude the bringing of suit for recovery of damages by any party injured, or any other action provided by said act approved February fourth, eighteen hundred and eighty-seven, entitled An act to regulate commerce and the acts amendatory thereof."

Mr. Justice White, in the opinion in Missouri Pacific Railway Company v. United States, supra, said:

"Although by the fourth section of the act (Act Feb. 19, 1903, c. 708, 32 Stat. 849 [U. S. Comp. St. Supp. 1905, p. 601]), conflicting laws are repealed, it is provided 'but such repeal shall not affect causes now pending, nor rights which have already accrued, but such causes shall be prosecuted to a conclusion, and such rights enforced in a manner heretofore provided by law, and as modified by the provisions of this act.' We think the purpose of the latter provision was to cause the new remedies which the statute created to be applicable as far as possible to pending and undetermined proceedings brought, prior to the passage of the act, to enforce the provisions of the act to regulate commerce. In the nature of things it cannot be ascertained from the record whether the railroad company now exacts the rates complained of as being discriminatory and which it was the purpose of the suit to correct; but if it does, of course the power to question the legality of such rates by a suit in equity, brought like the one now here, clearly exists. Under these circumstances we think the ends of justice will best be served by reversing the decrees below and remanding the cause to the Circuit Court for such further proceedings as may be consistent with the act to regulate commerce as originally enacted and as subsequently amended, especially with reference to the powers conferred and duties imposed by the act of Congress approved February 19, 1903, heretofore referred to."

While it must be confessed that the paragraph above quoted is not very perspicuous, there is in my mind no doubt that it was the thought and purpose of the court that when the cause went back to the Circuit Court, if the defendant railroad company was then continuing to "exact the rates complained of" in the original bill, instead of putting the Government entirely out of court by dismissing the bill, it might amend informally—perhaps by motion—pursuant to said section of the Elkins act, by showing that the railroad company was continuing in the given particular, the violation of the interstate commerce act, to avoid the reinstitution of like complaint. In the very nature of the law, the injunction to be granted would apply to and operate alone upon acts then being done by the railroad company. It is inconceivable that the court could have intended to say that under the Elkins act an injunction could be had for a past violation of the interstate commerce law, not being repeated at the time of granting the injunction under the Elkins act. Otherwise it would be violative of rules of law deeply rooted in the jurisprudence of the country. An injunction never goes to restrain a past act, already accomplished. It acts alone upon a wrong in fieri. Again, all legislative enactments are presumed to be prospective in their operation, unless the contrary is expressly declared. "Courts refuse to give statutes retroactive construction unless the intention is so clear and positive as by no possibility to admit of any other construction." Sedgwick's Construction of Statutes, etc., 166.

Mr. Justice Cooley, in his work on Constitutional Limitations (page

76), says in respect of the rule that legislative acts are presumed to be prospective in their operation, that:

"It is one of such obvious convenience and justice that it must always be adhered to in the construction of statutes, unless in cases where there is something on the face of the enactment putting it beyond doubt that the Legislature meant it to operate retrospectively. * * * Retrospective legislation is * * * commonly objectionable in principle and apt to result in injustice; and it is a sound rule of construction which refuses lightly to imply an intent to enact it."

In Finney v. Ackerman, 21 Wis. 271, the court, speaking of the language used in the law of 1865, which in its· broad sense might perhaps be held to apply to tax deeds previously executed, said:

"This language must, however, be construed as applying to deeds executed after the passage of the law. For the rule is well settled, that statutes are not to be construed as having a retrospective effect unless the intention of the Legislature is clearly expressed that they shall so operate. Seamans v. Carter, 15 Wis. 548, 82 Am. Dec. 696. That intention is not to be assumed from the mere fact that general language is used which might include past transactions as well as future. Statutes are frequently drawn in such a manner. Yet such general language is held to have been used in view of the established rule that statutes are construed as relating to future transactions, and not to past."

See full discussion of this question in State v. Grant, 79 Mo. 113, 49 Am. Rep. 218; Leete v. State Bank of St. Louis, 115 Mo. 184, 21 S. W. 788.

The doctrine of relation, like every other fiction of the law, has its limitations. It can never be made to bear fruit where its root was not planted in some antecedent, lawful right. This principle is aptly illustrated by the opinion of Judge Adams in Powers v. Hurmert, 51 Mo. 136–138:

"Relation is sometimes allowed to prevent injustice, as when an attachment has been issued and levied without sufficient affidavit, and an amended affidavit is afterwards made it will relate back so as to uphold the attachment and uphold the previous levy. But, in that case, the right to the attachment and its levy existed at the time, and only lacked the formality of a sufficient affidavit."

When the original bill was filed and the restraining order was made, there was no pre-existing equity in favor of the United States, sua sponte, at the request of the Interstate Commerce Commission, to institute such a proceeding for an injunction. The right to maintain it at the relation of the Government at common law did not exist. It did not attach under the interstate commerce statute for the all-sufficient reason that under Act Feb. 4, 1887, c. 104, § 16, 24 Stat. 384, as amended by Act March 2, 1889, c. 382, § 5, 25 Stat. 859 [U. S. Comp. St. 1901, p. 3165], it is provided:

"That whenever any common carrier * * * shall violate, or refuse or neglect to obey or perform any lawful order or requirement of the commission * * * it shall be lawful for the commission or for any company or person interested in such order or requirement to apply in a summary way, by petition, to the Circuit Court of the United States sitting in equity in the judicial district in which the common carrier complained of has its principal office, or in which the violation or disobedience of such order or requirement shall happen, alleging such violation or disobedience, as the case may be; and

the said court shall have power to hear and determine the matter * * * and if it be made to appear to such court, on such hearing * * * that the lawful order or requirement of said commission drawn in question ·has been violated or disobeyed, it shall be lawful for such court to issue a writ of injunction, etc., * * * and in case of any disobedience of any such writ of injunction * * * it shall be lawful for such court to issue writs of attachment, or any other process of said court incident or applicable to writs of injunction or other proper process, mandatory or otherwise, against such common carrier, etc."

Neither the bill of complaint nor the information herein alleges that any such order had ever been issued by the commission, and it is not claimed on behalf of the government that the commission ever proceeded beyond a preliminary inquiry. The jurisdiction of the United States Circuit Court to grant such injunction was conditioned upon the antecedent order of the commission, and failure of the defendant to comply therewith. Interstate Commerce Commission v. Western, N. Y. & P. R. R. Co. (C. C.) 82 Fed. 192, 196; Farmers' Loan & Trust Company v. Northern Pacific Railway Company (C. C.) 83 Fed. 249, 267; Sheldon et al. v. Wabash Railway Company et al. (C. C.) 105 Fed. 785; Interstate Commerce Commission v. Lake Shore & M. S. Railway et al. (C. C.) 134 Fed. 942, 946; Interstate Commerce Commission v. Louisville & N. R. R. Co. (C. C.) 73 Fed. 409; Central Stock Yards Company v. Louisville & N. R. Co. (C. C.) 112 Fed. 823, 827, 828. The Supreme court has recognized the correctness of this construction of the law, in East Tennessee, V. & G. Railway Company v. Interstate Commerce Commission, 181 U. S. 1, 27, 21 Sup. Ct. 516, 525, 45 L. Ed. 719, the court said:

"Whilst the court has, in the discharge of its duties, been at times constrained to correct erroneous constructions which have been put by the commission upon the statute, it has steadily refused, because of the fact just stated, to assume to exert its original judgment on the facts, where under the statute, it was entitled, before approaching the facts, to the aid which must. necessarily be afforded by the previous enlightened judgment of the commission upon such subjects."

So, in Interstate Commerce Commission v. Clyde Steamship Company, 181 U. S. 29–33, 21 Sup. Ct. 512, 45 L. Ed. 729, the court again declined to go into an original investigation, saying that that duty was laid upon the commission by the interstate commerce act in the first instance.

This being conceded as correct law, as it must be, there was no jurisdiction in this court to make the injunction order in question. It challenges all our conception of law and precedent that that which was dead at common law can be regalvanized and made alive by a post facto statute law. It would contradict the positive conclusion reached after most thorough investigation and discussion by Mr. Justice White in the case of Union Pacific Railway Company v. Wyler, 158 U. S. 285, 15 Sup. Ct. 877, 39 L. Ed. 983, to attribute to his ruling in Missouri Pacific Railway Company v. United States, supra, the purpose to hold that the original bill in this case, predicated alone of a common-law right to relief in equity, could be so amended as to rest for its support upon a statute law enacted nearly a year after the restraining order was made under the common-law suit, so as to give life to such

antecedent order, and subject the defendant to prosecution for contempt for violating an order that was coram non judice when made. It was expressly held in Union Pacific Railway Company v. Wyler, supra, that a cause of action based on a common-law right could not be amended so as to predicate a further proceeding thereunder based on a statutory right, for the reason that it was not a continuation of the original cause of action, but a substituted cause.

The repealing section of the Elkins act, saving the rights of causes then pending and rights which had already accrued, only declared that:

"Such causes shall be prosecuted to a conclusion and such rights enforced in a manner heretofore provided by law and as modified by the provisions of this act."

As there was no manner provided by law, prior to the Elkins act, enabling the United States to maintain such a bill in equity as the one under consideration, it had no rights in the proceeding to be saved. The words "as modified by the provisions of this act," being subjective rather than active in terminology, by no permissible liberality of construction can operate to make the Elkins act relate backward, so as to vitalize an order, which was a dead letter when made. As already suggested the only comprehensible thought in the mind of the court in the Missouri Pacific Railway Case, supra, in reversing the decree of the Circuit Court, and sending the case back, was to allow the United States attorney to proceed therein in the summary, informal manner provided by section 3 of the Elkins act, by showing that the railroad company was then continuing to do the act complained of in violation of the interstate commerce law. If, after the passage of the Elkins act, the United States attorney might have appeared in this case, by motion, or otherwise, alleging that the defendant was continuing its alleged violation of the interstate commerce law, it must be conceded that he would thereby have presented an issuable fact on which the defendant would be entitled to have a hearing; for, if the essential fact did not exist, there could be no predicate for continuing the proceeding under the Elkins act. No such movement has ever been made by the United States attorney. This contempt proceeding, therefore, rests for its sole support upon an injunctive order the court had no jurisdiction to make when issued. The only answer made to this in argument is that, after the passage of the Elkins act, the court by order continued in force the restraining order of March 25, 1902. The effect of this, however, was not to issue any new injunction, but only to continue the original order. The continuing order was bottomed alone upon the original bill of complaint. If the original order made thereon had no force and effect in law when first made, the court, by no post mortem act, could vitalize it.

If the position of the government's counsel be well taken, it must obtain that if, in 1910, the Interstate Commerce Commission should, on investigation, ascertain that the defendant railway company, out on the Pacific Coast where its lines extend, was granting rebates on carloads of cattle or California fruits, or at Chicago, Ill., was granting rebates on agricultural implements, furniture, or dry goods and groceries, instead of the United States attorney for California or

Illinois instituting proceedings in that jurisdiction, as the Elkins act contemplates and provides, the United States attorney for the Western District of Missouri could move against the railroad company in this court for contempt of the restraining order made in March, 1902, based upon allegations that at that time the defendant was granting rebates on grain and packing-house products in this jurisdiction. If the restraining order of 1902 is not itself restrained by the rule ejusdem generis, then as to all the railroads, to wit, the Atchison, Topeka & Santa Fé Railway Company, the Chicago, Rock Island & Pacific Railroad Company, the Chicago & Alton Railroad Company, the Missouri Pacific Railway Company, the Chicago, Burlington & Quincy Railroad Company, and the Chicago, Milwaukee & St. Paul Railway Company, which were enjoined under a like bill and under a like order at the same time, there need never be any order made on them by the Interstate Commerce Commission to desist from granting rebates at any place or at any time, on any kind of commodity shipped by them, or any action taken against them by the United States District Attorney in the jurisdiction where the offense should be committed. But no matter when, where or how, or on what subject-matter of interstate traffic either of said roads may grant rebates, a resort in this court to a contempt proceeding against the company, under the order issued in March, 1902, predicated of a suit in equity of which this court had no jurisdiction, would hit the blot.

It must be conceded, beyond tolerant cavil, that a bill praying for an injunction must be predicated of some specific wrong then being done by the defendant to the complainant. The only violations of the provisions of the interstate commerce act specified in the bill as being committed at the time consisted in the granting of forbidden rebates on grain and packing-house products shipped from within this district. The eighth paragraph of the bill contained a broad, general averment based on information and belief, that on many other principal commodities, constituting the bulk of railroad traffic between the states, comprising the ordinary necessities of life, the said defendant grants unlawful rebates, etc., between the states and between the states and territories, to certain other favored shippers whose names are to the orator unknown. No venue is laid in this sweeping "omnium gatherum" charge; and no particular specification. It requires no citation of authorities to maintain that such indefinite, general allegation without place, whether in Illinois, Missouri, Kansas, Colorado, California, New Mexico, or Arizona, through which the defendant's lines extend, would not authorize the court to grant an injunction predicated thereon. The restraining order enjoined the defendant "from further acting under and enforcing or executing in any manner whatever any agreement to transport over defendant's railroad, or any part thereof, between the states, any packing-house products, dressed meats, grain, or the products of grain, or any other interstate traffic, at any greater or less rate than the rates named for such services in defendant's established schedule, etc." The authorities are all agreed that the general words "or any other interstate traffic," used in such connection, on the rule of noscitur a sociis and ejusdem generis, are con-

trolled by the antecedent specification, and are limited to objects "of like kind with those specified." United States v. Bevans, 3 Wheat. 336, 4 L. Ed. 404; St. Joseph v. Porter, 29 Mo. App. 605; State v. Bryant, 90 Mo. 534, 2 S. W. 836; Fuchs v. St. Louis, 167 Mo. 620, 67 S. W. 610, 57 L. R. A. 136; City of St. Louis v. Laughlin, 49 Mo. 559; Ex parte Neet, 157 Mo. 527, 57 S. W. 1025; State v. Schuchmann, 133 Mo. 111, 33 S. W. 35, 34 S. W. 842; Boatmen's Bank v. Fritzlen, 135 Fed. 650, 68 C. C. A. 288.

True it is that the general evil struck at by the interstate commerce act was unjust discriminations and rebates; yet, the specific subject-matter predicated in the bill of complaint was rebates being granted on grain and prepared meats and their products, being shipped from this jurisdiction. Allied products of those specified commodities would alone come within the requirements of the rule of ejusdem eadem. In the case of Swift v. United States, 196 U. S. 375, 396, 25 Sup. Ct. 276, 279, 49 L. Ed. 518, there was an injunction against the defendants, restraining them from using certain specific devices in violation of the anti-trust act, followed by a general clause, not dissimilar in its import to the general clause in the restraining order herein. When this general clause was attacked as vicious, in argument before the Supreme Court, the Attorney General of the United States said in reply:

"It is not true that this injunction broadly enjoins them against violations of the law. It enjoins them against certain specific conspiracies, well pleaded in the petition, well stated in the injunction, capable of being understood by one who desires to understand them. The particular paragraph of which my friend so much complains—the language or by any other method or device, the purpose or effect of which is to restrain commerce as aforesaid—is not open to the objection which he urges against it. There are specific devices set forth in the injunction and prohibited, and there is a general prohibition in the clause against any combination to restrain commerce as aforesaid; that is, according to the specific restraints which precede immediately this paragraph of the injunction."

In the opinion delivered by Mr. Justice Holmes, he says:

"We are bound, by the first principles of justice, not to sanction a decree so vague as to put the whole conduct of the defendants' business at the peril of the summons for contempt. We cannot issue a general injunction against all possible breaches of the law. * * * The general words of the injunction 'or by any other method or device, the purpose and effect of which is to restrain commerce as aforesaid,' should be stricken out. The defendants ought to be informed, as accurately as the case permits, what they are forbidden to do. Specific devices are mentioned in the bill, and they stand prohibited. The words quoted are a sweeping injunction to obey the law, and are open to the objection which we stated at the beginning that it was our duty to avoid."

Comment: This proceeding by contempt against the railroad company does not commend itself to my sense of fair play and "a square deal." The Hutchinson & Arkansas River Railroad Company is a railroad corporation, chartered by the state of Kansas. As such, it is presumptively invested with the power to exercise the right of eminent domain; and is presumptively a public carrier, authorized to carry freights for hire, although it may confine its operations to the transportation of the output of particular salt mills. No railroad

company connecting with or receiving freights from it has a right to demand or expect that it should carry and deliver to it freight free of charge. Whether its rates exacted are excessive and forbidden depends upon whether or not the creative act from the state or the state authority has fixed a maximum. If that be exceeded, it rests for correction in the right of visitation and interference on the part of the state. Congress has not undertaken to regulate the matter of an equitable division of rates on a joint tariff between two railroads. Under existing law, that is entirely a matter of private contract between the railroads, and if the joint through rate be less than the aggregate of the local rates fixed under the existing local laws, it is a matter of no concern to the government. The interstate commerce act only requires that the established schedule shall be filed with the commission, duly published; and that it shall then be adhered to by the joint parties. Any railroad company touching at Hutchinson, Kan., desiring to do business in carrying salt, finds the shipper entrenched behind a chartered railroad connected with the plant or plants of the salt manufacturer, which carries the entire output to the connecting roads. The shipper says to the railroad soliciting its business: We will ship over our short line and deliver to you on condition that you will make a joint through rate agreement with us, or for terminal facilities, giving us the lion's share of the income or charge, which may be an exorbitant exaction. The soliciting railroad must submit to the exaction or do no business with the large shipper. When thus coerced, some other shipper of salt at Hutchinson, who does not own any connecting short line road, becomes jealous of his competitor in business, and complains to the Interstate Commerce Commission, charging that the short railroad thus used is but a device by which such shipper obtains a rebate. Instead of the government invoking all of the prohibitory and penalizing provisions of the statutes against the real offender—the shipper—in such transactions, by directly proceeding against him in the United States Circuit Court of Kansas, where the offense was committed, it resorts to a prosecution for contempt, under an order 3½ years old, made in this jurisdiction, predicated of an entirely distinct subject-matter of traffic, and asks that the interstate railroad company alone be punished. And this court, in this ex parte proceeding against the railroad company, is asked to enter into an investigation of the character of the railroad at Hutchinson, as to who are its stockholders and operators, and the exact relation between it and the Hutchinson-Kansas Salt Company, and how the contract for through traffic rates between the parties was brought about. When the government shall pursue and punish such shippers, if guilty, it will strike at the very root of the rebate evil. And as I doubt not the railroad companies would profit by the result, they can best bring about the desired consummation by opening instead of closing the mouths of the men under their control when their evidence is sought.

There is a second like information against the defendant railway company, growing out of the rebates alleged to have been conceded to the Colorado Fuel & Iron Company, a corporation of Colorado, on shipments of coal from Trinidad, Colo., and Gallup in the territory

of New Mexico, to points in the territory of Arizona, El Paso, Tex., and to points in the republic of Mexico. These shipments were made in 1903–1904. This instance has attracted considerable public attention, because of the sensational association of the names of Mr. Ripley and Paul Morton then president and vice president, respectively, of the defendant company, with the transaction. The record in the case, however, consisting of the pleadings and the exhibits of evidence taken before the Interstate Commerce Commission, fails to furnish any foundation for imputing to those gentlemen any personal responsibility for the alleged violation of the interstate commerce law. Such matter, however, is extraneous. For the reasons assigned in the foregoing discussion, this court cannot proceed to sentence in this contempt proceeding. However reprehensible the conduct of the defendant railroad company, if it be as alleged in these transactions, may have been, or however much disposed this court be to compel obedience to its lawful mandates, it is persuaded that it is without authority in this proceeding to draw to it the questions involved, rightfully belonging to the jurisdiction of the United States Circuit Court for the Districts of Kansas and Colorado. "Thus saith the law" is a perpetual injunction upon the judge, when called upon to exert judicial power, which he may not disregard without standing in contempt of his own conscience.

It results that the motions to quash the informations are sustained.