## No. 8711.

RIVERSIDE RESERVOIR AND LAND COMPANY *v.* BIJOU IRRIGA-
TION DISTRICT, ET AL.

1. APPEAL AND ERROR—*Errors not Argued,* will not be considered.
2. —— *Decree upon Conflicting Evidence,* will not be reviewed.
3. WATER RIGHTS—*Appropriation—Reasonable Diligence.* Reason-
able diligence in the work of appropriation depends upon the
facts of the particular case, the nature and condition of the
region, the magnitude and difficulties of the work, the labor
supply, and the length of the season in which work is practical.
(Scott, J.)

*Error to Weld District Court, Hon. Robert G. Strong,*
*Judge.*

*En banc.*

Mr. WALTER E. BLISS, Mr. CHARLES F. TEW, for plaintiff
in error.

Mr. ROBERT M. WORK, Mr. GEORGE C. TWOMBLY, for de-
fendants in error.

Opinion by Mr. Justice Teller.

The plaintiff in error seeks to reverse a decree, entered
in a proceeding to adjudicate water rights, upon the ground
that the court erred in awarding to it two priorities, with
an interval of five years between them, instead of one
for the total of two, and all as of the earlier date.

The first decree is for seven hundred million cubic feet,
with priority as of April 1st, 1902, and the second is for
one billion, eight hundred and five million cubic feet, of
date of August 1st, 1907.

Defendant in error The Bijou Irrigation District is the
principal owner of the Empire Reservoir, to which was
awarded one billion, six hundred and forty-two million, six
hundred and twenty-nine thousand, eight hundred and
ninety cubic feet, with priority of date May 18th, 1905.

Defendant in error Painter is the owner of the Grand
View Seepage Ditch, which was given four cubic feet of

water as of date of May 15th, 1907. The error assigned as to that part of the decree is not argued, and, therefore, will not be considered.

The principal attack on the decree is on the ground that it is not supported by the evidence.

It is contended that the Riverside Reservoir, with capacity to the aggregate of both the priorities awarded to it, was one single project, carried on with diligence from its inception to its completion, and not at one time a completed work, with a subsequent enlargement.

The record contains a mass of evidence as to the manner and the time of doing the work on the reservoir, the inlet and the outlet, as well as evidence by way of contracts concerning the water rights contemplated, and statements of the promoters of the project. This included evidence, both written and oral, of admissions by those who were promoting the project and managing the work that the Riverside Company's priority was to antedate that of the Empire Reservoir only to the extent of the former's capacity at that time, which was seven hundred million cubic feet.

From all this it might reasonably be concluded that the original intent was to construct a system of irrigation by the storage of water to the extent later decreed to it as the first appropriation; and that the subsequent work done on it was by way of enlargement.

This conclusion is fortified by the fact that the owners, between the dates of the two appropriations, transferred their activities wholly to the south side of the river, and built there the Empire Reservoir, receiving irrigation district bonds therefor.

The referee found that the last work done on the Riverside system was an enlargement, and not the completion of an incompleted system; and the court approved and confirmed such finding. There being a clear conflict of evidence on that point, we are not at liberty to reject the findings of the court. The judgment is therefore affirmed.

Chief Justice Hill not participating.

Mr. Justice Scott dissents.

Scott, J., *dissenting*.

I cannot agree with the conclusion of the majority of the court. I am unable to find any material conflict in the evidence, and find that the issue in the case is not one of fact, but of law. The court did not find and could not have found, the facts differing in any material degree from what appears in the following statement.

The question to be determined is whether or not under the conceded state of facts, The Riverside Reservoir and Land Company proceeded with such reasonable diligence in the prosecution of its enterprise and application of water to a beneficial use, as will entitle it to a single priority dating from the time the trial court fixed its first priority in the decree, now under consideration.

The proceeding is to review an adjudication of priority of water rights for storage as between The Riverside Reservoir & Land Company and the Bijou Irrigation District. In the briefs and for convenience here these appropriators will be designated as plaintiff and defendant respectively. Both divert water from the South Platte river at or near the same point on the stream. The headgate of the Riverside reservoir is located on the north bank and the Bijou headgate on the south bank of the river.

The claim of priority of the Riverside is that it has an inlet with capacity of 1,000 cubic feet per second of time leading to the reservoir, a distance of about twelve miles. That the reservoir has a total storage capacity which may be drawn off through the outlet, of 2,860,000 cubic feet, with three outlet tubes of a total capacity of 1,500 cubic feet per second; that the lands irrigible by means of the several outlets are approximately 150,000 acres. The date of appropriation is claimed as of October 1st, 1895. Priority is claimed for 1,000 cubic feet of water per second of time, to the extent of an annual storage of 2,505,000,000 cubic feet.

The Bijou Irrigation District claims a priority for the Empire reservoir, as of date of November 1st, 1901, to the extent of 1,642,629,890 cubic feet. The trial court awarded priorities to these contending systems as follows: 1. Riverside Reservoir, April 1st, 1902, 700,000,000 cubic feet; 2. Empire Reservoir, May 1st, 1905, 1,642,629,890 cubic feet; 3. Riverside Reservoir, Aug. 1st, 1907, 1,805,-000,000 cubic feet.

It will be seen that both were awarded the entire capacity claimed, but that the priority of the Riverside, under its first decreed priority, April 1st, 1902, was limited to 700,000,000 cubic feet, and that the Empire Reservoir was awarded its full capacity claimed, as of an intervening date between the first and second awards to Riverside.

There is no question raised as to the date of the priority or capacity awarded to the Empire reservoir, owned by the Bijou District. The contention of Riverside is that its entire award should have been made as of priority at least as early as April, 1902, and that it is entitled to the one total and indivisible award, antedating the priority of the Empire reservoir, for the reason claimed that it prosecuted its construction with due diligence to final completion with its claimed capacity of 2,505,000 cubic feet with the beneficial use to the lands supplied by means thereof.

The Riverside company, at the time of the filing of its statement of claim, had constructed and was maintaining its system as therein claimed, with an inlet of at least eleven miles in length, and a capacity of from 750 to 800 cubic feet per second of time, with a reservoir well constructed, with a capacity of at least 2,505,000,000 cubic feet, the water rights thereof disposed of, with one outlet supply ditch of about one hundred miles in length, in addition to other outlet supply ditches and that the cost of the system was approximately one million dollars.

The only question is, was the system from its inception constructed with such diligence, and continuity of acts and purpose as to entitle it to a single priority, and as an en-

tirety, antedating that awarded to the Empire reservoir. That the conception and purpose of the promotors from the beginning was to construct such an irrigation system, and in substantial conformity with that now completed and in operation, very clearly appears.

Mr. D. A. Camfield in every step was the directing and controlling force, whether acting as an individual, or as the president and manager of succeeding corporations, from the commencement to the end. He seems to have conceived the undertaking, to have financed it, and to have directed the construction to the point of completion.

On January 27th, 1896, in conjunction with George H. West he filed map and statement pertaining to the Sanborn, now Riverside, and other reservoirs, in which it was claimed that work commenced by survey on one of these, Pawnee Pass Reservoir, May 11th, 1895, and that the statement was made as amendatory and supplemental to a former survey.

On July 1st, 1896, these same persons in connection with one Walker, filed another map and statement of the Pawnee Pass reservoir systems, showing extension of the system and Sanborn or Riverside reservoir, in substantial conformity with its present location, together with other ditches, and wherein it was recited that the statement and survey was supplemental to that filed on May 11th, 1895, and declaring the proposed available storage capacity for the Sanborn, now Riverside, reservoir, to be 3,060,525,600 cubic feet.

Afterward these rights were transferred to a corporation organized for the purpose, and named the South Platte Land, Reservoir and Irrigation Company. This company received official notice from the Department of the Interior, dated April 16th, 1898, of approval of its application for right of way over government lands, for the construction of Sanborn, now Riverside Reservoir, of the capacity and under the plans above suggested.

Again, map and statement for this reservoir was filed on the 9th day of July, 1903, showing the Riverside reservoir to be located as described in former maps and statements, and among other things, declaring:

"(a)  Owner is South Platte Company.

"(b)  Name is Riverside Reservoir, formerly Sanborn Draw.

"(c)  Description of reservoir, inlet, capacity as 3,060,-525,600 cubic feet, and inlet twelve miles long with 700 feet capacity intake.

"(d)  Work commenced February 1st, 1898."

It will be seen that at this time the property rights had been then transferred to a new corporation called The South Platte Company.  It will also be seen that from these repeated acts and statements the purpose and plan were the same, and substantially as now completed, from the time of the first survey, May 11th, 1895, to the time of the filing of the map and statement of July 9th, 1903, nearly two years prior to date of priority awarded by the court to the Empire reservoir.

It appears that the entire plan included the construction of a chain of reservoirs, with necessary ditches.

The efforts of the Riverside appropriators and the work done up to and including the year 1903, is best stated in the undisputed testimony of Mr. Canfield in substance as follows:

"I think Mr. George H. West and myself commenced survey of Riverside and Jackson Lake reservoirs in 1895, and I was personally engaged on the survey.  The inlet gate of reservoir is about a mile further up the river than where we surveyed it at that time.

Q.  Describe how the line of ditches that were to fill this reservoir then were located by you?  A  Starting from the point where the old Riverside ditch was and following that line down to the present line and on into the Riverside Reservoir and then taking it out at or near the present outlet of the Riverside Reservoir and then extending on

northeast about fifteen miles and there emptying into Jackson Lake Reservoir for the Jackson Lake feeder and from thence on, extending on above Jackson Lake through the narrows and on to the Wild Cat reservoir inlet and feeder of Wild Cat reservoir.

"We then also made a survey looking toward the construction of the reservoir called Pawnee Pass Reservoir, which was on the same line of survey over in Pawnee Basin, and we than filed statements declaring our intentions to make appropriations for these reservoirs. The inlets to all of said reservoirs as proposed started about a mile further up the river and entered the present line of inlet about a half mile below the present head of the inlet and traveled approximately the same line located to the Riverside Reservoir as is now constructed, and we called the Riverside, the Sanborn Draw Reservoir.

"While making those surveys I traveled over every foot of the ground and became acquainted with the topography of the country.

"I had to do with the construction work and superintending of the Jackson Lake Reservoir, and held the position of Vice President and General Manager and in fact attended to the entire financial part and superintending of construction of the Sanborn Draw (Riverside) and Jackson Lake Reservoirs. I made all arrangements for the funds with which to do the work and engaged the laborers and contractors, and made all contracts and signed them.

"There were two filings made for Jackson Lake, this original filing and one later, I should judge in 1903, with a separate and independent inlet, which inlet was really built for Jackson Lake and the first one surveyed was the inlet to the Riverside and is the inlet direct from the South Platte River to the Riverside and the only one used for the Riverside. When we made said survey for the Riverside we determined the line and I think for the first five miles there was a fall of 2.12 feet per mile and from there 5 feet per mile for about three miles and the balance of the way 15

feet per mile.  I have had considerable experience in construction of ditches and am acquainted with the method of construction known as erosion by plowing the ditch and running the water over it, which method we have used with the Riverside and the Bijou.  This is the plan we contemplated at the time we located the Riverside and began the work and this plan of construction has been followed throughout the construction.  The water we have run through this inlet for 6 or 7 years was for purpose of construction as well as for use.  After we had made the surveys above mentioned for the Jackson Lake, Riverside and Wild Cat Reservoirs we formed The South Platte Land, Reservoir & Irrigation Company (herein termed South Platte Co.), for the purpose of constructing said reservoirs and I became vice president and general manager, and the company became owner of the appropriation and claims for the reservoirs as well as for the Bijou ditch which is on the south side of the river; since which time I have been actively engaged in the work of promotion and construction of said works and followed no other business.

"After the Riverside inlet enters the hills of the South Platte bottom it follows a rough sandy valley to the Riverside Reservoir and if the water escaped from the inlet ditch, after it passed what is known as the Benton Fills and below where the ditch enters the hills, it would run into the Riverside Reservoir.  At the time we made our filings there was no dam in the river at the intake of the Riverside inlet, but there was a small ditch called the Riverside ditch and it was our purpose to enlarge that and run on the present line; and we did enlarge said ditch and did some work on it in June, 1897.

"These are large reservoirs and their construction required a large amount of money.  The fill of the Riverside Reservoir is four and a half miles, and that of Jackson Lake about three and a half miles in length.  We filed a change of the point of location of the head-gate of the inlet ditch to Riverside which made the new point about a mile further

down the stream. This intake ditch required a dam in the river and we constructed a temporary one of sacks and sand. We commenced construction work on the Riverside inlet as it is now located from the river to the reservoir in 1897. We did not commence work at the head of the ditch, but further down and had not at this time commenced work on the outlet of Jackson Lake.

"We worked continuously on either survey or trying to finance this project in '98, '99, 1900 and 1901, and I think it was in 1902 we commenced excavation work. The first contract in 1897 was let to Flemming Bros., who did three miles of work, but did not commence at the head-gate. The next contract was let to Baxter Bros., and they commenced work farther up the river. The Fleming Bros.' work commenced about two miles below the head-gate. In 1902, the work was let to J. A. Baxter, who was a ditch construction contractor, who sublet quite a lot to other parties, and I think he had about 50 or 60 teams working. Baxter did the work at the Benton fills and his work caused the inlet ditch to enter the hills below the Benton fills, which conducted the water to the valley through which it flowed to Riverside reservoir and after the ditch entered this valley about 90 or 95 per cent of it was constructed by plowing and using riprap on the lower side of the valley.

"Mr. Bradbury had the contract in 1903, for the entire length of the ditch below the point above mentioned where the ditch entered the hills and he constructed the ditch by putting in three fills and then making a small ditch the balance of the way in places where it was needed and that ditch will now carry from 800 to 1,000 feet and has been made by plowing and erosion.

"There were three depressions at lower end of the Benton Fill commonly called the Benton Lakes, the largest one was called the Benton Lake and at the deepest place it was about 20 feet in depth and originally covered 400 acres of land and on account of the ditch cutting down, the lake is practically drawn off, very little left. In 1903, after the

work had been done by Flemming, Baxter, Bradbury and others, the water was run through the Riverside inlet from the South Platte river to the reservoir and the first water was run by Mr. Bradbury's foreman, whose name I cannot remember, and I believe the water reached the Riverside Reservoir the first of December, 1903. I think it took about three weeks for the water to reach the reservoir, but now since the ditch is completed it takes about two or three days for the water from the river to reach the upper end of the reservoir which is about 11 miles from the river. I think approximately a mile and a half from the place where the water enters the reservoir to the place of discharge from the reservoir. Sanborn Draw or the Riverside Reservoir, was a natural basin and I have seen water in 1888, '89 and '90 stand in there for two or three years at a time.

"Baxter worked in 1902, and if my memory serves me, Bradbury commenced early in 1903, Bradbury and his subs must have had 350 teams. Prior to that time we have been engaged in letting contracts and getting funds to prosecute this project and also Jackson Lake, which was practically all one system. When Bradbury commenced his work in 1902 or '03 we had not filed on the inlet to Jackson Lake and I think Jackson Lake was commenced about that time. I believe work was done on Riverside first. When Bradbury took his contract he did work on the construction of the embankment to retain water in the site of the reservoir, and his subcontractors did work preceding the time that he did, Mr. Knowlton did work there on the ditch.

"I was also engaged in the financing, management and construction of Jackson Lake and inlet. Work was performed on the Jackson Lake inlet previous to Bradbury doing work on the Riverside. As near as I can remember work was commenced on the inlet to Jackson Lake somewhere in 1902, and the work on the two systems prosecuted together. Bradbury did not complete the embankments

on the Riverside Reservoir. We contemplated constructing the Riverside to something over 3,000,000,000 cubic feet and we prosecuted the work as far as we could with our funds.

"In 1897 I spent six months in New York and the East and in the summer of 1898 I spent four months and a half and we consummated arrangements three different times as far as we were concerned, but the money was not put up. We were constantly engaged in trying to raise money during all of this time for the Riverside, Jackson Lake and Bijou.

"We agreed to pay Bradbury $50,000 but he drew out something over $60,000, and we paid the difference in water rights. During this time of construction work, we spent the money as fast as we could obtain it and sometimes a good deal faster and paid for it when we could.

"It was not the intention of our company to limit the Riverside Reservoir in size by the amount of work done by Bradbury in 1903, but it was our intention to build it something over 3,000,000,000 and have the embankment riprapped, and Mr. Bradbury was experimenting on what was the best kind of riprapping. Bradbury did not construct the embankment over the entire four miles and a half, as it is now constructed and did not build it up to the present height at any place. When Bradbury left, the reservoir was not in condition to deliver water to the river. Kingsbury Bros. did most of the work on the outlet from reservoir to river and I think the work was done on this outlet in 1904, and '05. Up to this time, that is 1905, no work had been done on the outlet from Riverside toward Jackson Lake Reservoir or toward Wild Cat.

"Frank Baker, of Fort Morgan, took a contract and constructed a permanent dam at the headgate of Riverside inlet. This is a pile dam. Our company authorized the expenditure of some $4,500 to $4,800 for the construction of the dam, which is still there and answers the purpose of diverting the water into the inlet ditch. Ever since Brad-

bury left and up until the present time work has been go-
ing on on the inlet ditch by the use of teams and running
water."

This testimony is corroborated by other witnesses as to
work and labor performed for the years 1902 to 1908, in-
clusive.   There is no conflict in the testimony concerning
plaintiff's efforts in the matter of construction and develop-
ment.   Actual work of construction on the inlet in 1897
and continued to some extent each year thereafter.   This
work was generally by what is termed erosion, that is to
say by plowing the soil to be excavated and thereafter turn-
ing the water in the excavation and washing the loose soil
away and into basins or depressions along the line of ditch.
On the 19th day of May, 1904, soon after water was turned
into the basin which forms the reservoir, the plaintiff com-
pany entered into a contract with one Bradbury for the
construction of Riverside reservoir, including all its inlet
and outlet ditches to a capacity of 3,000,000,000 cubic feet.
Bradbury began the construction of the reservoir banks
in that year and under a subsequent contract enlarged the
inlet for a distance of three or four miles.   It also appears
that Bradbury, during this period; did extensive work on
the outlets.

Bradbury under his contract of 1904, constructed the
banks of the reservoir so that after final filling it contained
approximately 700,000,000 cubic feet of water.   The out-
lets, or at least the one to the South Platte river was not
completed until 1905, and water turned out in 1906, for use
in irrigation.

Under a contract with one Smiley in 1907, and com-
pleted by DeRemer and Olsen, the line of embankment was
raised around the reservoir, a distance of about four and
one-half miles, this including riprapping, was completed
so that the reservoir was completed to its present capacity
of 2,505,000,000 cubic feet in 1908.   During this period
also, the inlet was greatly enlarged and its banks riprapped.

Then without dispute, from the beginning of actual

construction which the court fixed as of April, 1902, the plaintiff and its grantors up to 1908, had constructed and placed in actual operation at least one of the most extensive irrigation systems within the state. There appears to have been no intervening year between these dates when there was not a vast amount of construction work performed on some one or all branches of the system, the diversion dam, the inlet, the reservoir proper, or the outlets and ditch extensions, which now supply a vast territory for irrigation.

There appears to be two contentions upon which defendant relies to sustain the judgment of the court allotting a divisable priority in the case of the Riverside reservoir. The first is that the reservoir at the time it was built to the extent of a capacity of 700,000,000 cubic feet, was a completed reservoir and system, and that there was prior to July 1st, 1907, no intention on the part of the owners of the Riverside reservoir to construct said reservoir to any larger capacity.

The second contention is that prior to the making of a contract with the Riverside Irrigation District, for the sale of certain water rights, persons who were at the time directors of the plaintiff company, made certain representations or promises to other persons who were about to organize said irrigation district, to the effect that the Empire reservoir would be entitled to a priority as against the Riverside, in excess of 700,000,000 feet.

To hold that it was not the intention of the promoters or owners of the Riverside Reservoir, at any time from its inception to the time of its completion, to construct such reservoir above a capacity of 700,000,000 cubic feet or to any capacity less than it now has, is so manifestly against the evidence as to forbid any such conclusion.

The very first survey statement and map, every subsequent statement and map, the application to and approval by the Department of the Interior, contracts for construction, construction in itself, the undisputed testimony of those connected with the enterprise, from the beginning to

completion, are in absolute agreement as to the purpose and intent to make the capacity not less than as now completed. As against this, there is only the testimony of witnesses to the effect that it appeared to be completed, coupled with the fact of cessation of work for a time on the reservoir banks, but not on the inlet and outlets, which, at least during a part of such time, were being constructed and enlarged sufficiently to supply and distribute the present capacity.

If we are to concede all this testimony to be true, it cannot weigh as against, nor is it in conflict with the uncontradicted evidence showing good faith and reasonable diligence.  Otherwise, by reason of the very nature and character of the undertaking, there can be no safety for investments in legitimate irrigation projects, so necessary and vital to our material public and private interests.

Further, all testimony is in agreement that by reason of the loose and sandy character of the soil, riprapping of the reservoir was essential to its stability and sufficiency, and the testimony is in agreement, further, that the banks were not riprapped while the reservoir stood at the capacity of 700,000,000 cubic feet, and it is clear that there was no intention so to do.  But when the structure was to be completed, the contract provided for such riprapping, and it was so completed.

As a further contention, it appears that each water right in the reservior was fixed at one million cubic feet, from the first sale and at all times.  In May, 1907, the Riverside Irrigation District was organized for the purpose, and entered into a contract of purchase with plaintiff's grantor. The Riverside Reservoir & Land Company, whereby the latter sold 1201 water rights in the Riverside reservoir to the irrigation district, for the sum of $717,500.00 in bonds of the district, and in this manner the system was finally financed to its completion, with capacity of 2,505 water rights of one million cubic feet each.  But just how this may tend to prove a prior intent not to construct be-

yond the then capacity of 700,000,000 cubic feet is not made clear.

As to the second contention it appears that the South Platte company, or what is termed the parent company, was the owner at one time of the three portions of the system then existing, The Bijou, The Jackson and the Riverside. The Bijou District was organized and purchased that system in 1900. The Jackson Lake & Reservoir Company was organized and took over the Jackson Lake system in 1905, and the Riverside Reservoir & Land Company took over the Riverside system in 1904. Substantially the same people were at the time the stockholders in the three corporations.

Judge McCreary, testifying for the plaintiff that there was no agreement as to priority at the time of the sale to the Bijou Company, says:

"At the time we were negotiating for sale of Bijou ditch and built Empire there was some talk by W. B. Chapman, A. D. Bennett, John Odell, P. W. Putnam and John T. Warren in which they asked for a stipulation that the Riverside had a capacity of something like 700,000,000 cubic feet and was to be built no larger and that the Empire reservoir when completed would have a priority junior to the 700,000,000 or thereabouts and senior to any other claims pertinent to that reservoir and there is nothing in any contracts to show that any such contract was made and there was nothing verbal or written in the way of a contract to that effect. I remember these people discussed that subject and wanted to get that kind of a concession and I said to some of them at that time that the ultimate settlement of these priorities and their relative standing would be in the hands of the courts and they could be determined on evidence when the time came."

It is not contended that there ever was a contract, verbal or written, between the Riverside corporation that sold, and the Bijou District that purchased the water rights, concerning any such claim of priority by the latter to a

priority as against Riverside in excess of 700,000,000 cubic feet.

An examination of the form of water right contracts for rights sold prior to the completion of the reservoir to a capacity of 700,000,000 cubic feet and prior to the sale of the 1,201 additional rights to be taken from the increased capacity to 2,505 million cubic feet, discloses no statement or suggestion that the reservoir was to be limited to 700,-000,000 cubic feet.

A. D. Bennett, for the defendant, testified that at the time of the sale to the Bijou district there was a verbal agreement or understanding that the Bijou company was to take priority over Riverside in excess of 700,000,000 cubic feet. P. W. Putnam says that it was understood by us that Empire would have such priority. Mr. W. B. Chapman testified:

"Am acquainted with the Empire reservoir and Riverside reservoir, prior to organization of Bijou district, contention arose between the district and the Riverside company or Camfield, McCreery, Shields and others composing the company and we had lots of talk about the reservoir and litigation arose. They had done some work on the Riverside, got it up I believe to 700,000,000 or partly done to that height. The people that owned the Empire were the same that claimed the Riverside and the district entered into negotiations with Riverside officers relative to settlement of respective rights of the reservoirs. After we had agreed to buy the Bijou we didn't think they would build any larger than 700,000,000 on the Riverside. We bought the Bijou ditch and contracted with them to build the Empire,—buy the Bijou ditch all but 190 rights and were to pay $737,000 in bonds I believe, and when this contention arose and interest in the Empire was claimed by the district and P. W. Putnam, B. B. Putnam, L. L. Stimson, John T. Warren and Charles F. Tew and it was my understanding that in the settlement of these claims a representation was made by the owners of the Riverside that if the dis-

trict would buy the ditch stock and give them a contract to construct the Empire reservoir and intake and enlarge the Bijou ditch and pay John T. Warren and Charles F. Tew $20,000 for their alleged interest in Empire, the claims or appropriation should relinquish the first 700,000,000 in the Riverside and the Empire should take preference of any other water over the Riverside."

It will be seen that this all refers to negotiations and conversations between individuals prior even to the organization of the Bijou District, and not to any agreement or dealings with it.

There are other witnesses who testify to similar conversations and understandings had with individual officers of the Riverside Company, but no one testifies that there was any such agreement between the Riverside and Bijou corporations.

The corporation owner of an irrigation system is held under our law to be a trustee for individual consumers; and talks, understandings or even promises of individual officers may not bind the corporation as against the rights of the consumer whom the corporation represents. It is clear that there was no conveyance nor agreement to convey on the part of the Riverside corporation as such.

It is the settled rule of law that while appropriations ripen into a right only when the water is actually applied to the beneficial use, and although the appropriation is not deemed complete until the actual diversion or use of the water, yet if such work be prosecuted with reasonable diligence, such right relates to the time when the first step was taken to secure it, but such due diligence must be continued from the inception to completion.

What is a reasonable time and what constitutes reasonable diligence depends largely on the facts of the particular case. In this must be considered chiefly the physical circumstances of the locality, the nature and condition of the region to be traversed, its accessibility, the length of the season in which work is practicable, labor supply, the mag-

nitude of the enterprise and the difficulties of construction. 40 Cyc. 712.

In this instance the system was constructed through a new and practically undeveloped and unsettled country. The uneven and loose sandy condition of the soil naturally tended to make progress slow, even under the most favorable circumstances otherwise.

The good faith undertaking of such an enterprise with reasonable hope of a successful termination under all the circumstances of this case was an exhibition of confidence and courage. Certainly the proof of want of reasonable diligence in the absence of bad faith should be clear and convincing in a case of this kind. Very early this court laid down the rule governing in such cases which it has consistently followed, when it announced in *Highland Ditch Co. v. Muffor,* 5 Colo. 325, that:

"That to constitute due diligence does not require unusual efforts or expenditures, but only such constancy in the pursuit of the undertaking as is usual with those in like enterprises. Such assiduity as shows a bona fide intention to complete the undertaking within a reasonable time."

*Water Supply & Storage Co. v. Larimer & Weld,* 24 Colo. 322; *Conley v. Dyer,* 43 Colo. 22, 51 Pac. 496, 46 L. R. A. 322; *Colo. Land & Water Co. v. Rocky Ford Canal, Reservoir, etc. Co.,* 3 Colo. App. 545, 34 Pac. 580; *Taughenbaum v. Clark,* 6 Colo. App. 235, 40 Pac. 153; *Beaver Brook Co. v. St. Vrain Co.,* 6 Colo. App. 130, 40 Pac. 1066.

These cases clearly justify the conclusion that under the facts and circumstances of this case, there was reasonable diligence and good faith on the part of the Riverside Company, and that under the doctrine of relation that company is entitled to have the priority for its reservoir in its entirety as claimed, decreed to be 2,505,000,000 cubic feet, and as of date as early at least as fixed by the trial court.

This view seems to be well sustained by the great weight of judicial authority. It is clear that no contract or agreement was made by the plaintiff corporation with the defendant district, whereby the former waived or agreed to convey its right of priority to the defendant, nor do we find evidence of any such acts or conduct as will constitute an estoppel upon the part of the plaintiff from claiming and asserting its priority of appropriation as against the defendant.

I am authorized to say that Mr. Justice Garrigues concurs in this opinion.

Decided May 6 A. D., 1918. Rehearing denied December 2, A. D. 1918.