## No. 10,631.

## HOLBROOK IRRIGATION DISTRICT *v.* FORT LYON CANAL COMPANY.

Decided May 14, 1928.   Rehearing denied July 9, 1928.

Mr. Marion F. Miller, Mr. Fred A. Sabin, for plaintiff in error.

Mr. H. L. Lubers, for defendant in error.

*Department One.*

Mr. Justice Adams delivered the opinion of the court.

This case is before us on review of a statutory adjudication of water rights in water district No. 17, irrigation division No. 2. The sole parties to the case in this court are the Holbrook Irrigation District and The Fort Lyon Canal Company, hereinafter respectively designated as the district or the Holbrook district, and the company. The district sued out a writ of error to review that part of the decree which awards certain priorities to the company. In doing this, the district followed our rule 25, and filed a petition for alignment of parties, in which it named itself and the company as owners that may be adversely affected by the proceedings in this court.

The structures owned by the district to which decrees were awarded in this proceeding are the Dye reservoir, and the Holbrook reservoir, or reservoir No. 1. These decrees are not contested. They are as follows: To Dye reservoir, by original construction, priority dated October 10, 1903, for 600 second feet from the Arkansas river, limited to the amount and extent of 4,500 acre feet; to Dye reservoir, by enlargement, priority dated September 3, 1909, 400 second feet from Arkansas river, limited to 3,486 acre feet; to Holbrook or reservoir No. 1, by enlargement, priority dated September 15, 1909, 600 second feet from Arkansas river, limited to 3,196 acre feet.

The company carries water to its stockholders, and operates on a mammoth scale. It owns the Fort Lyon

canal, in the Arkansas river valley, for which canal it appears the company has a decree, obtained in another proceeding, for over 900 cubic feet of water per second of time. The Fort Lyon canal is not here involved, except by way of explanation. As early as 1900, the company felt the need of storage rights to supplement direct irrigation on the lands of its stockholders, and the system involved in this proceeding is the result. It was gradually added to from time to time, until it attained its present proportions. The structures owned by the company to which decrees were awarded in this proceeding are for the irrigation of 100,000 acres of land. They consist of the Irrigating and Storage Canal, formerly known as the Storage Canal, the Horse creek reservoir, the Adobe creek reservoir, and the Thurston reservoir. The district is contesting such decrees. In this proceeding, the company obtained a decree for the irrigating and storage canal, by original construction, with priority dated September 29, 1902, for 400 second feet of water from the Arkansas river for direct irrigation. In addition thereto, the following table will show the decrees awarded to the company's structures for storage rights:

Horse Creek Reservoir,
By original construction.

| Date of Priority | Source of Supply and Amt. decreed in sec. ft. | Limited to Amt. and extent in ac. ft. |
|---|---|---|
| 8–15–1900 | 5000 s. f. from Horse cr. | |
| 9–29–1902 | 840 s. f. " Ark. riv. | 26,887 ac. ft. |
| 3– 1–1910 | 1466 s. f. " Ark. riv. | |

The water from Horse creek comes through a feeder known as the supply canal. The water from the Arkansas river to above reservoir is conveyed from the river to the irrigating and storage canal, thence to the bed of Horse creek, thence to the supply canal, thence to Horse creek reservoir, and from thence to an outlet ditch for irrigation. Horse creek is often dry but is subject to floods.

## Horse Creek Reservoir,
### By enlargement.

| Date of Priority | Source of Supply and Amt. decreed in sec. ft. | Limited to Amt. and extent in ac. ft. |
|---|---|---|
| 6–12–1908 | 5000 s. f. from Horse cr. | |
| 6–12–1908 | 840 s. f. " Ark. riv. | 1113 ac. ft. |
| 3– 1–1910 | 1466 s. f. " Ark. riv. | |

## Adobe Creek Reservoir,
### By original construction.

| Date of Priority | Source of Supply and Amt. decreed in sec. ft. | Limited to Amt. and extent in ac. ft. |
|---|---|---|
| 9–29–1902 | 8631 s. f. from Adobe cr. | |
| 9–29–1902 | 840 s. f. " Ark. riv. | 61,575 ac. ft. |
| 3– 1–1910 | 1466 s. f. " Ark. riv. | |

Adobe creek, like Horse creek, often has little if any water in it, but is subject to floods. Water from the Arkansas river to Adobe creek reservoir, is carried through the irrigating and storage canal. The outlet of this reservoir is a continuation of such canal, that is, as outlined, the reservoir not only contains storage water, but is also used as a conduit for a very small part of the canal.

## Adobe Creek Reservoir,
### By enlargement.

| Date of Priority | Source of Supply and Amt. decreed in sec. ft. | Limited to Amt. and extent in ac. ft. |
|---|---|---|
| 12–29–1908 | 8631 s. f. from Adobe cr. | |
| 12–29–1908 | 840 s. f. " Ark. riv. | 25,425 ac. ft. |
| 3– 1–1910 | 1466 s. f. " Ark. riv. | |

## Thurston Reservoir.

| Date of Priority | Source of Supply and Amt. decreed in sec. ft. | Limited to Amt. and extent in ac. ft. |
|---|---|---|
| 3–24–1905 | 400 s. f. from Horse cr. | |
| 3–24–1905 | 1200 s. f. from Adobe cr. | 2500 ac. ft. |
| | and seepage, waste and storm waters. | |

History of this proceeding. A brief account thereof is necessary to an understanding of our opinion. This adjudication was regularly initiated in 1911 on the petitions of other claimants to the use of water in water district No. 17. Hearings, pursuant to notice, were held before successive referees appointed by the trial court. The parties hereto and others filed their statements of claims, offered evidence, and had their claims allowed. On September 20, 1921, Atwood, the last referee, reported his findings and proposed decree to the trial court. The district filed objections and exceptions to such findings and proposed award in favor of the structures of the company. After argument, the court on August 30, 1922, overruled all objections, approved the referee's report and caused final decree to be entered. November 8, 1922, the district filed a motion for a rehearing and for a new trial of the issues involved. The court denied it, and the district thereupon proceeded to perfect its case for review in this court.

In March, 1923, the Holbrook district had the case docketed in this court on writ of error. It was duly prosecuted, abstract and brief were filed, and the case set for oral argument, but the order therefor was later vacated on motion of the company, over the objections of the district. This was done on a showing that while the case was pending here on writ of error, the trial court, under date of December 17, 1923, had ordered the August 30, 1922, decree reopened at the request of the company and other claimants, and had referred the matter back to the referee for additional evidence. To this the district objected and excepted. Additional evidence was taken concerning the claims of the company for its reservoirs, and no move was made in this court by either party for over four years.

After the additional evidence had been completed, the referee made another report of his findings and proposed decree as to the company's reservoirs, in some particulars modifying the former decree. It was approved by the trial court, and on February 3, 1927, a modified decree

180

as to such reservoirs was entered accordingly. This was also unsatisfactory to the district, and in November, 1927, it came back to this court with a supplemental record and assignments of error, covering the proceedings last had in the trial court. We are now reviewing one case on a record and supplemental record four years apart, and events that have taken place either in the field or in court during the past twenty-seven years.

The company's first exhibit is its Exhibit A, which shows its present structures. It is entitled, "Map showing Canals and Reservoirs of the Fort Lyon System—Property of the Fort Lyon Canal Company—Otero, Bent Kiowa and Prowers Counties Colorado * * * May, 1910, B. F. Powell, Chief Engineer." The so-called "reservoir canal," for which a filing was made in the office of the state engineer, but which was never constructed, is not shown on this map. It is fully discussed hereafter.

The sketch herewith shows, in a general way, the locations of the company's canals and reservoirs referred to in the opinion. The line of the survey for the "reservoir canal," which was never built, is indicated by a dotted line. It was testified that the Fort Lyon Canal is approximately a little over one hundred miles long.

IRRIGATION SYSTEM
OF THE
FORT LYON CANAL CO.

Between 1900 and 1910, the company filed eight maps and statements in the office of the state engineer. It

offered certified copies of them all in evidence in this proceeding. They have a decided bearing on our opinion and must be stated. They are as follows:

Exhibit DD. Filed with state engineer November 15, 1900. Map and statement of the company's reservoir site and supply canal. (This is for Horse creek reservoir.) No source of water supply stated, but map shows the supply canal connected with Horse creek. Claims survey made August 15 to 25, 1900. Capacity of supply canal, 2,000 second feet; capacity of reservoir, 11,400 acre feet.

Exhibit EE. Filed with state engineer September 10, 1903. Map and statement of Adobe creek reservoir and branch of reservoir canal. Source of supply of ditch is flood, surplus or other unappropriated waters of Adobe creek, Horse creek and Arkansas river. Capacity of ditch, 50,000 second feet; capacity of reservoir, 61,575 acre feet. Work is claimed to have begun on September 9, 1902.

Exhibit FF. Filed with state engineer September 10, 1903. Map and statement of "the reservoir canal of the Fort Lyon Canal Company." Source of supply, Arkansas river; proposed carrying capacity, 7,260 second feet; a "feeder canal" to Horse creek reservoir and Adobe creek reservoir. Claims work begun by survey, September 29, 1902.

Exhibit GG. Filed with state engineer May, 22, 1905. Map and statement of Thurston reservoir, and two other reservoirs not here involved. Source of supply not stated, but map shows Ft. Lyon canal. Capacity, about 8,261 acre feet. Work begun March 24, 1905.

Exhibit HH. Filed with state engineer April 18, 1906. "Map of storage canal from the Arkansas river to Horse creek and Adobe creek reservoirs." Source of supply, Arkansas river; capacity, 840 second feet; water to be stored in said reservoirs, to be used for irrigation and domestic uses. "Work was commenced by survey on the 25th day of January, A. D. 1906."

Exhibit II. Filed with state engineer December 20, 1907. "Amended map of Horse creek reservoir—supply canal inlet and outlet ditches owned by The Ft. Lyon Canal Company." Shows, inter alia, that the company "has caused to be located, amended and enlarged, the Horse creek reservoir, supply canal, inlet and outlet ditches, as hereinafter mentioned; * * * (1) Height of dam 25 feet. * * * (3) The total capacity of said reservoir as amended and enlarged, is 26,887 acre feet of water; * * * The capacity of said reservoir as originally filed was 11,400 acre feet of water. (4) The source of supply of the said reservoir is from Horse creek and from the Arkansas river through its storage canal of this claimant. * * * Work was commenced by original survey on the 15th day of August A. D. 1900." At this point, the draftsman continued with the words, "and by amended survey on the," but the sentence remained unfinished and the words last quoted have a line drawn through them, so that no date of commencement by amended survey or enlargement is given. The statement concludes with the words, "The intent hereof being to amend said system by the changes and additions shown upon this map and statement, without waiver of any previously acquired rights or abandonment thereof. There are no changes in or additions to supply canal, inlet and outlet ditches, as shown upon the filings heretofore made therefor."

Exhibit JJ. Filed with state engineer December 30, 1907. "Supplemental and amended map and statement of the irrigating and storage canal of the Fort Lyon Canal Company." Source of supply, Arkansas river; capacity, 840 second feet; water to be stored in Horse creek, Adobe creek, Thurston and other reservoirs, to be used for irrigation and other beneficial uses. "Fourth: Work was commenced by the original survey of the reservoir canal herein designated as the irrigating and storage canal of The Fort Lyon Canal Company, on the 29th day of September, 1902, and by actual construction on the

line finally adopted, as is shown by the map and statement filed April the 18th, 1906, on the 25th day of January, 1906, and the said ditch or canal is now constructed from the headgate to the point where it crosses Horse creek; and that some excavation and construction has been done upon the line at several points east of Horse creek." Here follows in another handwriting: "Work on this reservoir and supply canal system was commenced June, 1900, by survey of the Horse and Adobe creek reservoir and their inlet canals."

Exhibit KK. Filed with state engineer on March 1, 1910. It is entitled, "Supplementary Map and Statement of Claim on account of 'The Irrigating and Storage Canal' and "The Horse Creek Reservoir' and 'The Adobe Creek Reservoir' of The Fort Lyon Canal Company—Otero, Bent and Kiowa Counties Colorado." This map and statement is the most elaborate of all. It refers to and is a consolidation of all previous filings above mentioned except Exhibit GG for the Thurston reservoir, which is many miles distant from the other structures mentioned. It claims all that was claimed before, and more. The statement refers to this final map as "the original plan" of the company. It claims an enlargement of the irrigating and storage canal to a capacity of 2,306 second feet; canal to be used for direct irrigation; also for storage and other purposes. It says, among other things: "Work on the entire system was commenced by survey in the month of June, 1900, on the Horse creek and Adobe creek reservoirs, and on the reservoir canal September 29, 1902, and by actual construction of the line finally adopted for the irrigating and storage canal January 25, 1906, and surveys and actual work of increasing said canal to a capacity of 2306 cubic feet per second of time have been made and done by claimant on and at various times since January 25, 1906, and down to and including the date hereof." The statement refers to "the enlargement and extensions" of the Horse creek reservoir, depicted in Exhibit

II; it shows the completion of certain of its structures; and enlargement and increased appropriations for the Horse creek and Adobe creek reservoirs. It makes a separate statement of the "reservoir canal," in these words: "This reservoir canal, as shown upon map and statement heretofore filed * * * is amended only in the change of the alignment thereof, as shown upon the map of which this statement is a portion." (Note—The "reservoir canal" does not touch the irrigating and storage canal at any point.) Exhibit "KK" consists of five large blue prints, all with closely written words and figures, besides the maps. We have stated enough of the contents for our purposes.

All of the above mentioned maps bear the certificate or affidavit of the president of the Ft. Lyon Canal Company, and most of them contain the affidavit of the company's engineer, certifying to their correctness.

The district's Exhibit 2 is a photostat copy of a "Map and Statement of the Irrigating and Storage Canal of The Fort Lyon Canal Company," filed in the office of the Register of the U. S. Land Office at Pueblo on December 30, 1907, in connection with a right of way application over government lands for such canal. It is certified by the company's president as having been adopted by its board of directors, and bears the affidavit of Powell, its chief engineer. Powell swore that "The survey * * * was made under his direction as chief engineer of the company, and under its authority, commenced on the 25th day of January, 1906, and ending on the 27th day of July, 1907. * * * "

Other facts will be stated in the opinion.

1. New Trial—Reopenings and Reviews. The first assignment of error by the district in the supplemental record reads: "The court erred in entering its order of December 17, 1923, for the reopening and review of its general decree entered in this proceeding August 30, 1922." Counsel for the district argue that the statute allowing a review within two years contemplates that

good cause must be shown therefor, and that the petitioner has been aggrieved, citing section 1789, C. L. 1921; *Crippen-Lawrence Inv. Co. v. Burroughs,* 27 Colo. 155, 157, 60 Pac. 487; *Rio Grande Land & Canal Co. v. Prairie Ditch Co.,* 27 Colo. 225, 229, 60 Pac. 726; *Multa Trina Ditch Co. v. Stobaugh,* 76 Colo. 451, 231 Pac. 48; *Greeley & Loveland Irrigation Co. v. Handy Ditch Co.,* 77 Colo. 487, 240 Pac. 270. The legal proposition is correct, but its application has been misapprehended. While it is true that the trial court reopened the matter at the instance of the company and others, counsel for the district seem to have forgotten that they themselves had previously asked the trial court for the same thing—a rehearing in the matter and new trial of the issues involved—and that in the original record they assigned error because their request had been refused. The district, having finally obtained that for which it asked, is not now in a position to complain because its request was granted. It will not be heard to say that good cause was not shown, or that nobody was aggrieved by the August, 1922, decree. Consequently this assignment of error is not well taken. However, when the company went back to the district court, and asked for and procured a reargument and review while the case was pending here, it was tantamount to a confession by the company of error, as claimed by the district in its twenty-seventh assignment (original record) alleging that a rehearing and new trial should have been granted. This fact alone justifies the assessment against the company of all costs involved in the original record, if there were no other reasons for it. And the company must also bear costs on the supplemental record for the errors continued there.

2. The "Reservoir Canal." There is not now and never has been any such canal, except on paper, Exhibit FF, supra, and as said above, even that trace has disappeared from the company's latest map. No priority was awarded to it, but priorities to other structures of the company were awarded, based on the original survey of the "reservoir canal."

Exhibit FF, filed with the state engineer in 1903, shows this "reservoir canal" as a proposed ditch twenty-six miles long, with a capacity of 7,260 second feet, to carry storage water from the Arkansas river to Horse creek and Adobe creek reservoirs. The statement claims work was begun on September 29, 1902. Estimated cost, $350,000. Although that was over twenty-five years ago, no construction work has been done on it, and the company's counsel informs us that it never intends to, because it is too expensive. It hardly seems possible, but it is true, that the 1902 survey of the "reservoir canal"— a mythical ditch—and the paper case made by the 1903 filing therefor, which claimed storage water from the Arkansas river, was ingeniously used to obtain priorities under date of 1902, for Arkansas river water as follows: 400 second feet for direct irrigation, through the irrigating and storage canal; also 840 second feet through such storage canal, to extent of 26,887 acre feet, for storage in Horse creek reservoir; and also 840 second feet through such canal, to extent of 61,575 acre feet for storage in Adobe reservoir. In other words, to get 1902 priorities for Arkansas river water for three of its structures, a large canal for a double use—direct irrigation and storage—and two large reservoirs, the company sought to invoke the doctrine of relation by a fiction that work on these three was commenced by survey on a fourth structure that never existed except as a transient thought, abandoned on account of its prohibitive cost of $350,000.

We are not saying that decrees ought not to be awarded in favor of the irrigating and storage canal and the Horse creek and Adobe creek reservoirs, for they are so entitled, but not to Thurston reservoir. Our discussion thus far has related to the fictitious 1902 date.

3. It is to be remembered that all of the waters of the Arkansas claimed by the company in this proceeding, are first diverted from the river through the irrigating and storage canal. This canal superseded the company's

abandoned previous thought of the reservoir canal, the proposed headgate of which is about 12 miles up the river away from the storage canal. The two are separate in every sense. Survey on the storage canal, was begun about three years and four months after the survey of the reservoir canal. Compare Exhibits EE and HH. In HH, filed in 1906, there was a frank and fair declaration by the company, made under oath by its president and engineer, that work was commenced on the storage canal on January 25, 1906. Later, however, the thought of the value of an earlier date seems to have occurred, and beginning in December, 1907—Exhibit II and from there on—the company adjusted its maps and claims so as to show that work on such canal was begun on September 25, 1902, and persuaded the referee to allow it.

Such an award cannot be sustained. We cannot forget the gap of three years and four months between commencement of work on the reservoir canal by survey, and that on the storage canal. No actual work between those dates on either of them—the storage canal not even having been surveyed until 1906—and no work ever having been done on the reservoir canal, is not continuous labor or reasonable diligence. It is also pertinent to observe that if, as the company informs us, the reservoir canal was too expensive to spend any money whatever on its construction or completion, it was too cheap to bring to court. If the company could not afford to build it, the district or other appropriators on the stream could not afford to be mulcted with a senior priority for a phantom ditch, or based thereon. The 1902 priority dates were not even based on a continuous purpose or idea; they were predicated on an abandoned intention. The company's admission concerning the reservoir canal, is as effective as a disclaimer, filed in a public office.

4. It is just as we said in *New Loveland and Greeley Irr. & Land Co. v. Consolidated Home Supply Ditch Co.*, 27 Colo. 525, 529, 62 Pac. 366: "Mere intention of an

appropriator to build a reservoir and make it a part of a general system of appropriating water, is of itself insufficient to constitute a vested right to store water therein. That intention must be manifested by a completion of the different parts of the general plan and a beneficial use within a reasonable time. This duty is incumbent upon an appropriator who bases his right upon such claim.'' And as pointed out on page 531 of the same opinion, the claimant's intention was never carried out. We have a similar condition here; the plan for the reservoir canal was never carried out; it is not a part of the company's reservoir system; such plan was abandoned in favor of another ditch—the storage canal—for the carriage of water from the Arkansas river. The latter has been completed; it is a part of the system, and decree has been allowed therefor.

5. Counsel for the district cites cases to show that the abandonment of a ditch is not an abandonment of a water right, but they bear no relation to the facts here. In the instant case, there was no abandonment of either a ditch or vested right; it was merely a voluntary abandonment of an intention. The difference is obvious. The error lies in permitting the company to transplant its abandoned intention as to the reservoir canal, to its real intention as to the storage canal, and thus to antedate the priority of the latter beyond its lawful right, as well as to impose a double appropriation, direct irrigation and storage, on the latter, by virtue of the company's abandoned intention for one appropriation only under the reservoir canal.

6. The admitted facts of this case, coupled with the company's sworn statement in its filing in the state engineer's office, declaring that work on the storage canal was commenced on January 25, 1906, was an abandonment of its claim, if it ever had merit, that work was commenced thereon on September 29, 1902, by virtue of the reservoir canal. *Water Supply & Storage Co. v.*

*Larimer & Weld Irr. Co.,* 24 Colo. 322, 340, 51 Pac. 496, is applicable.

7. We have not overlooked the company's maps and statements, Exhibits II, JJ and KK, but they are diametrically opposed to some of its former public declarations on oath, as well as its previous 1906 corporate minutes to which we hereafter call attention. They were undoubtedly made to show the altered designs and larger claims that were afterwards allowed by the referee and approved by the trial court. We are not criticising the learned trial court nor the referee in the conduct of a difficult task, complicated by the company's exaggerated claims and confusing maps and statements, but it is plain that the last three exhibits mentioned, were based on the company's untenable theories concerning the doctrine of relation; they were not wholly based on facts, nor on what had actually happened in the field. Otherwise, previous maps and statements were false, and the company's president, engineer, and its stockholders at their called meetings did not speak the truth in 1906, or before 1907. We shall not so impugn them, nor permit the decree to do so.

8. Counsel for the company says in his brief on the supplemental record: "The notice given by maps and statements, and by construction, was notice to all persons of its claim to the waters of the Arkansas river, Horse creek and Adobe creek, * * *." But if you see a man digging a ditch, and he has filed a statement in a public office that it is claimed for storage rights, how are you to tell that he means that he will ask for a decree for both direct irrigation and storage from the same ditch? If he swears that work was commenced in 1906, who supposes that he means 1902? If he files a map showing Horse creek as the source of water supply, how can you know that he means Horse creek and the Arkansas river? Does he know himself what he wanted? If he knew in 1900 what he claimed in 1910, why take eight maps and statements with constantly increasing demands, over a period of a decade, to tell it? Why not have said it in 1900,

instead of filing misleading documents in the state engineer's office from then on? If he publicly announces in 1900 that he is about to build a reservoir—the Horse creek reservoir—with a capacity of 11,400 acre feet by original construction, who is to know that seven years later he will claim for the same reservoir 26,887 acre feet by original construction? (See company's Exhibits DD and II.) The referee found in such flagrant contretemps, a false basis for the company's decrees.

An answer to the above questions will be found in the syllabus of *Fruitland Irrigation Co. v. Kruemling,* 62 Colo. 160, 162 Pac. 161. It correctly states our views as applied to this case. It reads: "To invoke the doctrine of relation as applied to the appropriation of water, the appropriator must show, as the first step to which he would refer his right, an open, notorious, physical demonstration, conclusively indicating a fixed purpose to diligently pursue, and within a reasonable time acquire, a right to the use of the water. It must be reasonably calculated to put others on inquiry as to the proposed use, the volume to be appropriated, and the consequent demand upon the source of supply.

\* \* \*

"The doctrine is for the benefit of the one who invokes it. Anything tending to its abuse is to be carefully scrutinized."

9. We have no doubt, as shown by the company's oral testimony, that the company's officers did, as early as 1900 or 1902, entertain a hope, and possibly an expectation, but without any definite plan, to get water some time from some place on the Arkansas river for storage, as a man might say, and most men believe, "Some day I shall enlarge my business." But as said in *Fruitland Co. v. Kruemling, supra,* at page 167, "The law does not permit an intending appropriator to invoke the benefit of remote contingencies to unduly extend the doctrine of relation." And as further said in *Baca Irrigating Ditch Co. v. Model Land & Irr. Co.,* 80 Colo. 398, 407, 252 Pac. 358. "There

must be an intent to appropriate a definite amount of unappropriated water to a definite and beneficial purpose. There must be affirmative notice also of such intention.''

10. Maps and statements filed in compliance with law in the state engineer's office are prima facie evidence of intention. Section 1649, C. L. 1921. But if an appropriator be allowed to repudiate his statements and enlarge his claims at will to the detriment of other water users, the filings would be worse than nothing, because of their misleading character.

11. The statute recognizes two classes of appropriations for irrigation, one for ditches diverting water directly from the stream, and one for the storage of water, to be used subsequently. *Greeley & Loveland Irrigation Co. v. Huppe,* 60 Colo. 535, 155 Pac. 386; *New Loveland, etc., Co. v. Cons., etc., Ditch Co., supra.* These cases are authority for the proposition that an appropriation for one of such purposes is not an appropriation for the other. This being so, there is all the more reason why a mere inchoate right or claim for storage, should not under the doctrine of relation be permitted to ripen into a decree for the two purposes, with priority dating from the beginning of work for storage only, and thus put an additional burden on the stream not contemplated when the appropriation was initiated. This is in keeping with the rule of definiteness and certainty, required of those who seek the benefit of the doctrine of relation, the principle stated in *Fruitland Irrigation Co. v. Kruemling,* and *Baca, etc., Co. v. Model, etc., Co., supra.*

The original map and statement claiming work by original survey of the storage canal, show that the purpose was to take water through it from the Arkansas river, for storage in Horse creek and Adobe creek reservoirs. It was to have been a feeder canal only, and the company got storage priorities for such water in these two reservoirs, on proof that the canal and reservoirs were part of the same storage system, and that the orig-

inal survey and subsequent work on the canal was for the benefit of such reservoirs. We think it was, and are disposed to allow the credit. But later, the company decided to use the canal for both of such purposes, and was awarded priorities for both by original construction. This was right as to storage, but wrong as to direct irrigation. The first storage priorities to the two reservoirs named, for Arkansas river water through the canal named, should date from January 25, 1906, the date of commencement of work thereon for such purpose, but the priority for direct irrigation should date from commencement of work for that purpose and from the first notice given of its dual purpose, the earliest authentic record of which is the company's Exhibit JJ, filed in the office of the state engineer on December 20, 1907, which will be the date of priority to the irrigating and storage canal.

We have allowed the company the full benefit of the doctrine of relation for each separate appropriation.

12. The decrees to the several reservoirs should have been limited to one annual filling for each reservoir. *Windsor Res. & Canal Co. v. Lake Supply Ditch Co.,* 44 Colo. 214, 98 Pac. 729.

13. Our reason for limiting the priority by original construction for storage in Horse creek reservoir, to 2,000 second feet of Horse creek water, to amount and extent of 11,400 acre feet, will be found in Exhibit DD, which shows the amount of the original appropriation. Exhibit II, shows the first enlargement of 15,487 acre feet. The company there said that it was an enlargement, but it was erroneously allowed as 26,887 acre feet by original construction.

14. The storage canal map filed in 1906, represents what is known as the Powell survey, Powell being the company engineer. At a meeting of the stockholders of the company held on April 16, 1906, the ''directors and proper officers,'' were authorized and empowered to build such a ditch upon the line of survey made by Powell. A bond issue in the sum of $250,000 was voted, $130,000 of

which was "for the purpose of building the above described ditch, and finishing and completing the Horse creek reservoir." The above fortifies our belief that we are correct as to the date of commencement of work on the storage canal. It agrees with the map and statement filed in the state engineer's office and with the district's Exhibit 2, copy of map filed by the company in the United States Land Office.

15. The district offered no evidence except that of one expert, a civil engineer, whose chief employment was in the preparation of tabulations and computations from the company's evidence. Counsel for the company relies on the rule that judgments on conflicting evidence will not be disturbed, but when a proponent itself furnishes all the conflict, the appellate court allows itself more latitude, especially when documentary evidence is involved. "We are in as good a position to judge such evidence as the trial court." *Conklin v. Shaw,* 67 Colo. 169, 177, 185 Pac. 661. And a judgment wrong on any hypothesis and without any basis under the evidence will be reversed. *Lenander v. Graves,* 45 Colo. 246, 248, 100 Pac. 403; *Robeson v. Miller,* 4 Colo. App. 313, 35 Pac. 880.

16. What constitutes reasonable diligence is discussed at length in the briefs, but the question has been so frequently and exhaustively treated in our former decisions that we do not consider it necessary to attempt to add to it. One of the most recent cases is *Riverside Reservoir & Land Co. v. Bijou Irrigation District,* 65 Colo. 184, 176 Pac. 117, where the general proposition is stated that it depends on the facts of the particular case, the nature and conditions of the region, the magnitude and difficulties of the work, the labor supply, and the length of the season in which work is practical. Other cases are cited in that opinion. It would take too long to particularize the evidence; it shows an irrigation enterprise that costs the company upwards of $825,000, which anyone must regard as of great magnitude. It shows also the overcoming of many difficulties. We think that after the com-

pany planned and actually commenced its several units, it proceeded continuously with reasonable diligence to completion and beneficial user of the waters appropriated.

17. The maps and statements have been of vast help to us; we have been assisted very materially also by the able briefs, and do not wish to leave the impression that we believe that the company or its representatives intended to wilfully falsify to any material matter. We think they overestimated the value of mere intentions, and that a desire to apply the doctrine of relation, by means of legal fictions at the expense of actual facts, was the chief error. Perhaps the most striking feature of the result thus obtained, was the finding concerning the storage canal. It shows that work was progressing diligently thereon, beginning at a time which, in truth, was three years and four months before it ever had a name, before it was surveyed, and before the ground had been scratched. This is carrying imagination too far.

18. The soundness of our conclusions concerning the doctrine of relation can be tested by another simple rule, common to all judgments. They must conform to the proof. And relation, when invoked, must have a connection with an actual fact. To the extent that the judgment or decree goes beyond such fact, it does not conform to the proof. As said by Federal Judge Phillips: "The doctrine of relation, like every other fiction of the law, has its limitations. It can never be made to bear fruit where its root was not planted in some antecedent, lawful right." *U. S. v. Atchison, T. & S. F. Ry. Co.*, 142 Fed. 176, 187, cited under "Relation," Bouvier's Law Dictionary, (3rd Ed.) p. 2862. The company did not have even an inchoate right, before commencement of work by survey or actual construction.

19. Although the subject of notice of a proposed water appropriation is important, and is discussed here and in our previous opinions, this is not the only ground of our present decision. As pointed out in *Sterling Irrigation Co. v. Downer*, 19 Colo. 595, 598, 36 Pac. 787, the statu-

tory proceeding to adjudicate priorities of right to the use of water, is not an ordinary civil action or proceeding; it is a proceeding sui generis, to which the rules governing ordinary civil actions are not always applicable. And wholly aside from the subject of notice, the court has no right to allow a decree to which the evidence shows the claimant is not entitled, and will not knowingly do so, even if there should be but one claimant in such proceeding. In this case, the manifest injury to the Holbrook district, comes from the fact that it is a water user, against whom decrees for senior priorities have been erroneously granted.

20. The date of priority awarded the irrigation and storage canal for direct irrigation will be changed from September 29, 1902, to December 20, 1907.

21. The decree to Horse creek reservoir, will be changed to show that it is entitled, by virtue of original construction, to the storage of 11,400 acre feet of water, under the following priorities: August 15, 1900, 2,000 cubic feet of water per second of time from Horse creek, through the supply canal from said stream; January 25, 1906, 840 second feet from the Arkansas river, through the irrigating and storage canal, (hereafter called the storage canal); and March 1, 1910, 1,466 second feet from said river through said canal.

Also, to show, by first enlargement of said Horse creek reservoir, that it is entitled to 15,487 acre feet of water, under the following priorities: January 25, 1906, 840 second feet from the Arkansas river, through the storage canal; December 20, 1907, 5,000 second feet from Horse creek, through the supply canal; and March 1, 1910, 1,466 second feet from the Arkansas river, through the storage canal.

Also, to show, by second enlargement of said Horse creek reservoir, that it is entitled to 1,113 acre feet of water, under the following priorities: June 12, 1908, 5,000 second feet from Horse creek, through the supply

canal; June 12, 1908, 840 second feet from the Arkansas river, through the storage canal; and March 1, 1910, 1,466 second feet from the same river through the same canal.

There will be allowed but one annual filling of said reservoir, from whatever sources the water may be derived.

22. The decree to Adobe reservoir, will be changed to show that it is entitled, by virtue of original construction, to the storage of 61,575 acre feet of water, under the following priorities: January 25, 1906, 8631 cubic feet of water per second of time from Adobe creek, through its supply canal; January 25, 1906, 840 second feet from the Arkansas river, through the storage canal; March 1, 1910, 1466 second feet from the same river through the same canal.

The decree to Adobe reservoir, which shows that it is entitled, by virtue of enlargement, to 25,425 acre feet of water, under the several dates of priorities and from the streams named as shown in our statement of facts, is approved, and will remain unchanged.

There will be allowed but one annual filling of said reservoir, from whatever sources the water may be derived.

23. A final decree for storage in Thurston reservoir is premature, to say the least. The chief sources of supply claimed for it are from Horse creek and Adobe creek. At the last hearing, Powell, the company's engineer, testified that no water has ever been diverted from Horse creek into this reservoir. He was also asked: "Did you ever divert any water from Adobe creek into the Thurston reservoir?" He answered: "Well, probably some water indirectly, probably came into the Thurston reservoir thru the main canal." (Ft. Lyon Canal.) This testimony is too indefinite to be used as a basis for a definite decree for 2,500 acre feet, or for any amount. There is, in fact, no satisfactory evidence of the amount of water diverted into Thurston reservoir from any source, unless it be Fort Lyon canal water, decreed for direct irrigation,

the surplus of which cannot be taken into the reservoir, and made the basis of an independent decree for storage. *Greeley & Loveland Irrigation Co. v. Huppe, supra.* The priorities awarded to Thurston reservoir will be set aside.

24. By comparison, it will be seen that we have not disturbed the decree as to the aggregate quantities of water severally awarded; first, in second feet, to the irrigating and storage canal for direct irrigation; second, in acre feet, to Horse creek reservoir for storage, and third, in acre feet, to Adobe creek for a like purpose, but we have directed a revision as to dates of priorities, by original construction and enlargement. The priority numbers in the general decree will be correspondingly changed by the trial court; the data for such purpose is not contained in the record brought to us.

The judgment or decree is reversed in part, with directions to enter a decree in accordance with this opinion.

MR. JUSTICE BURKE, sitting for MR. CHIEF JUSTICE DENISON, MR. JUSTICE WHITFORD and MR. JUSTICE BUTLER concur.

## On Rehearing.

MR. JUSTICE ADAMS.

Concerning the irrigating and storage canal, counsel for the company say: "At no time has the company, through its attorney, either in briefs or oral argument, made any claim or contention against the position of the district alleging error in the award of the lower court." Our opinion changed the priority date of this canal for direct irrigation from September 29, 1902, to December 20, 1907. The district's assignment of error was that the court should not have awarded the company, for said canal, any priority at all for direct irrigation, and since the parties appear to be in accord that it was error, the opinion will be modified to deny any decree in favor of said canal.

In other respects, our opinion will not be changed, and the petition for rehearing will be denied. It consists largely in a reargument of the matters contained in the briefs. Counsel are mistaken in supposing that we failed to apply the unit rule, to allow credit for work on different parts of their several structures, to the system as a whole. If we had not done so, the decree would have been less favorable to the company.